Edith Miller, J.
Cynthia S., born on November 25, 1965, was placed in foster care on June 7, 1967. Prior to placement, she and her two sisters were cared for by the natural mother, Virginia S. and/or the paternal aunt and paternal grandmother. *936 The natural father, James D., abandoned the mother shortly after Cynthia’s birth.
Placement was requested by the New York City Police Department after they found all three children alone in the family apartment, having gone there to question the mother concerning a criminal matter.
The Department of Social Services, Special Service for Children Division, became the agency responsible for the supervision of the foster care of Cynthia and the agency that has been charged with the responsibility for planning for the welfare of the child during the six years she has been in foster care.
On July 13,1973, pursuant to section 392 of the Social Services Law, a hearing was held to adduce proof as to what is in the best interest of the child. Both the natural mother and the child were represented by separate counsel.
The court found from the uncontroverted testimony of the foster parents and the caseworker for the Department of Social Services that Cynthia has continually resided in the same foster home where she was placed more than six years ago. She has her own room in a 10-room, one-family house in Queens where she resides with her foster parents Martha and Douglas J. and three foster sisters who are unrelated to the foster parents. Cynthia is doing well in school and will enter third grade in September. Her health is good and she has a happy relationship with her foster family.
The foster parents love Cynthia and want to adopt her but cannot do so at this time since the natural mother has refused to surrender the child for adoption.
Prom the time of placement in June, 1967 until July 20, 1972, the natural mother did not visit her daughter nor did she plan with the agency for the welfare of her child.
According to the testimony of the mother, she could not do so because of the turmoil of, her own personal life. The mother further testified that during this five-year period when she did not see her child, she conquered her drug habit and the criminal behavior that flowed therefrom and is presently working as a drug counsellor for Reality House, earning $7,000 a year. At this time the mother is living with a man she does not intend to marry but has stated that her plan is to stop living with this man, move into a larger apartment and create a home life for all three of her children. The two older daughters are living with the paternal grandmother and paternal aunt during the week and stay with the mother most weekends.
In the matter herein, the court is presented with the classical dilemma of parental rights in conflict with children’s rights. *937 Cynthia has now been in the foster home for more than six years. These six years coincide with the formative years of her life when a child is evolving an identity. During the five-year period when the natural mother failed to function as a parent, she became a stranger to the child. Therefore, Cynthia cannot grasp the concept, at this time, that there is a biological mother to whom she truly belongs. Her psychological concept of “ mother ” is Mrs. J. The foster parents have provided her with day by day parenting, wholesome family experiences and loving care, thereby creating indelible ties to which attention must be paid.
The Law Guardian representing the child has strongly urged the court not to remove Cynthia from the home of the foster parents where she is deeply rooted. The Law Guardian is especially concerned about the radical differences in life-styles between the foster parents and the natural mother. The foster parents are providing a traditional family setting where Cynthia is growing up with a mother who functions as a housewife and is therefore home during the day and a steadily employed father who returns to the family home each evening. In contrast, the natural mother is a part-time parent to her two older daughters, is employed full-time, and her children not only reside mostly with the paternal grandmother and paternal aunt, they are on the welfare budget of that household. Since the mother does not plan to marry the man she is presently living with, Cynthia does not even have a potential father figure to relate to.
The petition of the Department of Social Services prays for foster care to be continued pending plans to free the child for adoption. The contention of the Department of Social Services is that it would be in the best interest of the child to be adopted by the foster parents to ensure her continued healthy development. They are seeking such an order pursuant to section 392 (subd. 7, par. [c]) of the Social Services Law.
The position of the natural mother is that, although the child should not be uprooted at this time, she should be given the opportunity now that she is rehabilitated to assume the care and custody of her child. She relies on the presumption that it is in the child’s best interest to be returned to the natural parent and believes that with casework services, Cynthia will be able to make the adjustment with a minimum of trauma.
During the five-year period from June, 1967 until July, 1972, the agency had clearly defined statutory grounds for instituting an action to terminate parental rights pursuant to article 6 of the Family Court Act and pursuant to section 384 of the Social *938 Services Law. There is no prerequisite in said statutes that the agency first obtain a court order before instituting such action. The agency was certainly aware of the developing love and familial commitment which was taking, place between the foster parents and the child and yet no attempts were made by the agency to legally free the child for adoption during this optimum period.
In June, 1972, the agency began to encourage the natural mother to visit the child. The first visit on July 20, 1972 was difficult for both mother and child. The natural mother did not visit the child again until November 29, 1972 and that contact was followed by another visit on December 21,1972. Then there was another hiatus until the case was calendared for foster care review on May 18, 1973. At that time the court made it perfectly clear to the mother of the consequences of her ambivalence towards the child. The mother then visited the child in May and June, 1973.
If the agency had proceeded at an earlier time towards their plan to have Cynthia adopted, in all likelihood they would have been successful and the child would have been able to remain permanently in the home of the foster parents where she is secure and happy. The court has seen the chid, in camera, and is therefore aware of the child’s strong identification with her foster parents. However, by not proceeding towards their stated goal and by reintroducing the natural mother back into the picture, other factors must now be considered by this court.
The court finds that at this time, regardless of the mother’s past conduct, she is presently a fit person making a positive contribution to the community. She has now visited the child five times in the past year and has stated her willingness to continue to re-establish ties with her daughter towards .the goal of eventual reunion. Therefore, it is doubtful whether an action to terminate parental rights would be successful at this time..
But what about Cynthia’s rights? Who can foresee the consequences of eventually removing her from her present foster family, in which she has such a strong emotional investment, to a natural family setting that she may or may not be able to relate to. This case clearly illustrates the wisdom of the Legislature in providing for foster care review by the Family Court after a period of 24 months in voluntary placement.
The review places responsibility upon each agency to formulate affirmative plans to meet the foster child’s needs within a two-year period rather than permitting the child to drift into *939 the limbo of long-term foster care and the problems attendant therein.
If the natural family is a potential resource, then casework services can be offered to strengthen the family, making it possible for the child to be returned before deep emotional ties are formed with other persons. If tt¡.e natural parents have social problems that they refuse to solve, then alternative plans can be made. In the matter herein, by not moving promptly within a reasonable period of time, this case has become needlessly complicated.
The court is mindful of a recent Supreme Court decision, Rothman v. Jewish Child Care Assn. (N. Y. L. J., Nov. 1, 1972, p. 17, cols. 2, 3-4) in which Justice Nadel, faced with a similar problem where the mother was not an unfit person, concluded that:
“ If the court failed to consider the child’s mental and ¿motional well-being in this case it would indeed constitute a subordination of the child’s rights and interests. The child is now a nine and one-half year old girl. The tragic experience during the first two years of her life, the continued absence of the mother during the next six and one-half years, the persistent rejection of the mother by the child during the past year, the mother’s inability to develop any rapport or to cope with the child, regardless of who was at fault, and the comprehensive medical testimony that the child’s mental and emotional well-being would be endangered, warrant a finding that this case comes within the myriads of exceptions to the general principles of the primacy of parental custody.
“ On the evidence, the court concludes that to return the child to the mother at this time would endanger the child’s mental and emotional well-being, and would be against the best interests of the child. The petition is therefore dismissed.”
In view of the foregoing, the court finds that it would be in the best interest of Cynthia to remain in the foster home where she presently resides. Inasmuch as all parties agree that the return of the child under the present facts and circumstances would be premature, it is hereby ordered pursuant to section 392 (subd. 7, par. [a]) of the Social Services Law that foster care be continued.
And it is further ordered, that pthe child, the natural mother, and the foster parents, be referred to the Mental Health Services of the Family Court for psychiatric evaluation.
And it is further ordered that the agency submit a progress report on or before June 30, 1974 in respect to the following:
*940 1. Mother’s ability to assume responsibility for the child.
2. Child’s readiness for reunion with the mother.
3. Child’s relationship to the foster parents now that the mother is involved.