SMITH, ADMINISTRATOR, NEW YORK CITY HUMAN
RESOURCES ADMINISTRATION, ET AL. *v.* OR-
GANIZATION OF FOSTER FAMILIES FOR
EQUALITY & REFORM ET AL.

No. 76–180. Argued March 21, 1977—Decided June 13, 1977*

*Together with No. 76–183, *Shapiro, Executive Director, New York State Board of Social Welfare, et al.* v. *Organization of Foster Families for Equality & Reform et al.;* No. 76–5193, *Rodriguez et al.* v. *Organization of Foster Families for Equality & Reform et al.;* and No. 76–5200, *Gandy et al.* v. *Organization of Foster Families for Equality & Reform et al.,* also on appeal from the same court.

*Maria L. Marcus,* Assistant Attorney General of New York, argued the cause for appellants in Nos. 76–180 and 76–183. With her on the briefs for appellants in No. 76–183 were *Louis J. Lefkowitz,* Attorney General, *Samuel A. Hirshowitz,* First Assistant Attorney General, and *Mark C. Rutzick,* Assistant Attorney General. *W. Bernard Richland, Leonard Koerner,* and *Elliot P. Hoffman* filed briefs for appellants in No. 76–180. *Louise Gruner Gans* argued the cause for appellants in No. 76–5193. With her on the brief was *Marttie L. Thompson. Helen L. Buttenwieser* argued the cause for appellants in No. 76–5200. With her on the briefs was *Ephraim London.*

*Marcia Robinson Lowry* argued the cause for appellees in all cases. With her on the brief were *Rena K. Uviller* and *Martin Guggenheim.*†

MR. JUSTICE BRENNAN delivered the opinion of the Court.

Appellees, individual foster parents [1] and an organization of foster parents, brought this civil rights class action pursuant to 42 U. S. C. § 1983 in the United States District Court for

_____

†*Paul Piersma* filed a brief for the National Juvenile Law Center as *amicus curiae* urging reversal.

*Joseph Goldstein, Sonja Goldstein, Robert A. Burt, Paul D. Gewirtz,* and *Stephen Wizner* filed a brief for A Group of Concerned Persons for Children as *amici curiae* urging affirmance.

Briefs of *amici curiae* were filed by *William B. Haley* for the Community Service Society of New York; by *Michael J. Dale, Gene B. Mechanic,* and *Carol Sherman* for the Legal Aid Society of New York City, Juvenile Rights Division; and by *Herbert Teitelbaum* for the Puerto Rican Family Institute, Inc., et al.

[1] Appellee Madeleine Smith is the foster parent with whom Eric and Danielle Gandy have been placed since 1970. The Gandy children, who are now 12 and 9 years old respectively, were voluntarily placed in foster care by their natural mother in 1968, and have had no contact with her at least since being placed with Mrs. Smith. The foster-care agency has sought to remove the children from Mrs. Smith's care because her arthritis, in the agency's judgment, makes it difficult for her to continue to pro-

the Southern District of New York, on their own behalf and on behalf of children for whom they have provided homes for a year or more. They sought declaratory and injunctive relief against New York State and New York City officials,[2]

vide adequate care. A foster-care review proceeding under N. Y. Soc. Serv. Law § 392 (McKinney 1976), see *infra*, at 831–832, resulted in an order, subsequent to the decision of the District Court, directing that foster care be continued and apparently contemplating, though not specifically ordering, that the children will remain in Mrs. Smith's care. *In re Gandy*, Nos. K–2663/74S, K–2664/74S (Fam. Ct. N. Y. Cty., Nov. 22, 1976).

Appellees Ralph and Christiane Goldberg were the foster parents of Rafael Serrano, now 14. His parents placed him in foster care voluntarily in 1969 after an abuse complaint was filed against them. It is alleged that the agency supervising the placement had informally indicated to Mr. and Mrs. Goldberg that it intended to transfer Rafael to the home of his aunt in contemplation of permanent placement. This effort has apparently failed. A petition for foster-care review under Soc. Serv. Law § 392 filed by the agency alleges that the Goldbergs are now separated, Mrs. Goldberg having moved out of the house, taking her own child but leaving Rafael. The child is now in a residential treatment center, where Mr. Goldberg continues to visit him. App. to Reply Brief for Appellants in No. 76–180.

Appellees Walter and Dorothy Lhotan were foster parents of the four Wallace sisters, who were voluntarily placed in foster care by their mother in 1970. The two older girls were placed with the Lhotans in that year, their two younger sisters in 1972. In June 1974, the Lhotans were informed that the agency had decided to return the two younger girls to their mother and transfer the two older girls to another foster home. The agency apparently felt that the Lhotans were too emotionally involved with the girls and were damaging the agency's efforts to prepare them to return to their mother. The state courts have ordered that all the Wallace children be returned to their mother, *State ex rel. Wallace* v. *Lhotan*, 51 App. Div. 2d 252, 380 N. Y. S. 2d 250, appeal dismissed and leave to appeal denied, 39 N. Y. 2d 705 (1976). We are told that the children have been returned and are adjusting successfully. Reply Brief for Appellants in No. 76–5200, pp. 1a–10a.

[2] Defendants in the District Court included various New York State and New York City child welfare officials, and officials of a voluntary child-care agency and the Nassau County Department of Social Services. The latter two defendants have not appealed.

alleging that the procedures governing the removal of foster children from foster homes provided in N. Y. Soc. Serv. Law §§ 383 (2) and 400 (McKinney 1976), and in 18 N. Y. C. R. R. § 450.14 (1974) violated the Due Process and Equal Protection Clauses of the Fourteenth Amendment.[3] The District

---

[3] New York Soc. Serv. Law § 383 (2) (McKinney 1976) provides:

"The custody of a child placed out or boarded out and not legally adopted or for whom legal guardianship has not been granted shall be vested during his minority, or until discharged by such authorized agency from its care and supervision, in the authorized agency placing out or boarding out such child and any such authorized agency may in its discretion remove such child from the home where placed or boarded."

New York Soc. Serv. Law § 400 (McKinney 1976) provides:

"Removal of children

"1. When any child shall have been placed in an institution or in a family home by a commissioner of public welfare or a city public welfare officer, the commissioner or city public welfare officer may remove such child from such institution or family home and make such disposition of such child as is provided by law.

"2. Any person aggrieved by such decision of the commissioner of public welfare or city welfare officer may appeal to the department, which upon receipt of the appeal shall review the case, shall give the person making the appeal an opportunity for a fair hearing thereon and within thirty days render its decision. The department may also, on its own motions, review any such decision made by the public welfare official. The department may make such additional investigation as it may deem necessary. All decisions of the department shall be binding upon the public welfare district involved and shall be complied with by the public welfare officials thereof."

Title 18 N. Y. C. R. R. § 450.14, which was renumbered § 450.10 as of September 18, 1974, provides:

"Removal from foster family care. (a) Whenever a social services official of another authorized agency acting on his behalf proposes to remove a child in foster family care from the foster family home, he or such other authorized agency, as may be appropriate, shall notify the foster family parents, in writing of the intention to remove such child at least 10 days prior to the proposed effective date of such removal, except where the health or safety of the child requires that he be removed immediately from the foster family home. Such notification shall further

Court appointed independent counsel for the foster children to forestall any possibility of conflict between their interests and the interests asserted by the foster parents.[4]  A group of

advise the foster family parents that they may request a conference with the social services official or a designated employee of his social services department at which time they may appear, with or without a representative to have the proposed action reviewed, be advised of the reasons therefor and be afforded an opportunity to submit reasons why the child should not be removed.  Each social services official shall instruct and require any authorized agency acting on his behalf to furnish notice in accordance with the provisions of this section.  Foster parents who do not object to the removal of the child from their home may waive in writing their right to the 10 day notice, provided, however, that such waiver shall not be executed prior to the social services official's determination to remove the child from the foster home and notifying the foster parents thereof.

"(b) Upon the receipt of a request for such conference, the social services official shall set a time and place for such conference to be held within 10 days of receipt of such request and shall send written notice of such conference to the foster family parents and their representative, if any, and to the authorized agency, if any, at least five days prior to the date of such conference.

"(c) The social services official shall render and issue his decision as expeditiously as possible but not later than five days after the conference and shall send a written notice of his decision to the foster family parents and their representative, if any, and to the authorized agency, if any. Such decision shall advise the foster family parents of their right to appeal to the department and request a fair hearing in accordance with section 400 of the Social Services Law.

"(d) In the event there is a request for a conference, the child shall not be removed from the foster family home until at least three days after the notice of decision is sent, or prior to the proposed effective date of removal, whichever occurs later.

"(e) In any agreement for foster care between a social services official or another authorized agency acting on his behalf and foster parents, there shall be contained therein a statement of a foster parent's rights provided under this section."

[4] Joint App. to Jurisdictional Statements 54a.  See *Organization of Foster Families* v. *Dumpson,* 418 F. Supp. 277, 278 (SDNY 1976).

natural mothers of children in foster care [5] were granted leave to intervene [6] on behalf of themselves and others similarly situated.[7]

A divided three-judge District Court concluded that "the pre-removal procedures presently employed by the State are constitutionally defective," holding that "before a foster child can be peremptorily transferred from the foster home in which he has been living, be it to another foster home or to the natural parents who initially placed him in foster care, he is entitled to a hearing at which all concerned parties may present any relevant information to the administrative decisionmaker charged with determining the future placement of the child," *Organization of Foster Families* v. *Dumpson*, 418 F. Supp. 277, 282 (1976). Four appeals to this Court were taken from the ensuing judgment declaring the challenged statutes unconstitutional and permanently enjoining their

---

[5] Intervenor Naomi Rodriguez, who is blind, placed her newborn son Edwin in foster care in 1973 because of marital difficulties. When Mrs. Rodriguez separated from her husband three months later, she sought return of her child. Her efforts over the next nine months to obtain return of the child were resisted by the agency, apparently because it felt her handicap prevented her from providing adequate care. Eventually, she sought return of her child in the state courts, and finally prevailed, three years after she first sought return of the child. *Rodriguez* v. *Dumpson*, 52 App. Div. 2d 299, 383 N. Y. S. 2d 833 (1976). The other named intervenors describe similar instances of voluntary placements during family emergencies followed by lengthy and frustrating attempts to get their children back.

[6] The intervening natural parents argue in this Court that the District Court erred in not permitting them to raise certain defenses. In view of our disposition of the case, we find it unnecessary to reach this issue.

[7] In an opinion handed down at the same time as its decision on the merits, the District Court granted class certification to appellee foster parents, the named children, and the intervening natural parents. Joint App. to Jurisdictional Statements 42a. See *Organization of Foster Families* v. *Dumpson, supra,* at 278 n. 3. Appellants in No. 76–5193 challenge the class certification of the children. We perceive no error.

enforcement. The New York City officials are appellants in No. 76–180. The New York State officials are appellants in No. 76–183. Independent counsel appointed for the foster children appeals on their behalf in No. 76–5200. The intervening natural mothers are appellants in No. 76–5193. We noted probable jurisdiction of the four appeals. 429 U. S. 883 (1976). We reverse.

## I

A detailed outline of the New York statutory system regulating foster care is a necessary preface to a discussion of the constitutional questions presented.

## A

The expressed central policy of the New York system is that "it is generally desirable for the child to remain with or be returned to the natural parent because the child's need for a normal family life will usually best be met in the natural home, and . . . parents are entitled to bring up their own children unless the best interests of the child would be thereby endangered," Soc. Serv. Law § 384–b (1)(a) (ii) (McKinney Supp. 1976–1977). But the State has opted for foster care as one response to those situations where the natural parents are unable to provide the "positive, nurturing family relationships" and "normal family life in a permanent home" that offer "the best opportunity for children to develop and thrive." §§ 384–b (1)(b), (1)(a)(i).

Foster care has been defined as "[a] child welfare service which provides substitute family care for a planned period for a child when his own family cannot care for him for a temporary or extended period, and when adoption is neither desirable nor possible." Child Welfare League of America, Standards for Foster Family Care Service 5 (1959).[8] Thus,

---

[8] The term "foster care" is often used more generally to apply to any type of care that substitutes others for the natural parent in the parental

the distinctive features of foster care are, first, "that it is care in a *family*, it is noninstitutional substitute care," and, second, "that it is for a *planned* period—either temporary or extended. This is unlike adoptive placement, which implies a *permanent* substitution of one home for another." Kadushin 355.

Under the New York scheme children may be placed in foster care either by voluntary placement or by court order. Most foster-care placements are voluntary.[9] They occur when physical or mental illness, economic problems, or other family crises make it impossible for natural parents, particularly single parents, to provide a stable home life for their children for some limited period.[10] Resort to such placements

---

role, including group homes, adoptive homes, and institutions, as well as foster family homes. A. Kadushin, Child Welfare Services 355 (1967) (hereafter Kadushin). Cf. Mnookin, Foster Care—In Whose Best Interests?, 43 Harv. Educ. Rev. 599, 600 (1973) (hereafter Mnookin I). Since this case is only concerned with children in foster family homes, the term will generally be used here in the more restricted sense defined in the text.

[9] The record indicates that as many as 80% of the children in foster care in New York City are voluntarily placed. Deposition of Prof. David Fanshel, App. 178a. But cf. Child Welfare Information Services, Characteristics of Children in Foster Care, New York City Reports, Table No. 11 (Dec. 31, 1976). Other studies from New York and elsewhere variously estimate the percentage of voluntary placements between 50% and 90%. See, *e. g.*, Mnookin I 601; Areen, Intervention Between Parent and Child: A Reappraisal of the State's Role in Child Neglect and Abuse Cases, 63 Geo. L. J. 887, 921–922, and n. 185 (1975); Levine, Caveat Parens: A Demystification of the Child Protection System, 35 U. Pitt. L. Rev. 1, 29 (1973).

[10] Experienced commentators have suggested that typical parents in this situation might be "[a] divorced parent in a financial bind, an unwed adolescent mother still too immature to rear a child, or a welfare mother confronted with hospitalization and therefore temporarily incapable of caring for her child." Weiss & Chase, The Case for Repeal of Section 383 of the New York Social Services Law, 4 Colum. Human Rights L. Rev. 325, 326 (1972). A leading text on child-care services suggests that "[f]amily disruption, marginal economic circumstances, and poor health"

is almost compelled when it is not possible in such circumstance to place the child with a relative or friend, or to pay for the services of a homemaker or boarding school.

Voluntary placement requires the signing of a written agreement by the natural parent or guardian, transferring the care and custody of the child to an authorized child welfare agency.[11]   N. Y. Soc. Serv. Law § 384–a (1) (McKinney Supp. 1976–1977).   Although by statute the terms of such agreements are open to negotiation, § 384–a (2)(a), it is contended that agencies require execution of standardized forms. Brief for Appellants in No. 76–5193, p. 25 n. 17.   See App. 63a–64a, 65a–67a.   The agreement may provide for return of the child to the natural parent at a specified date or upon occurrence of a particular event, and if it does not, the child must be returned by the agency, in the absence of a court order, within 20 days of notice from the parent.   § 384–a (2)(a).[12]

---

are principal factors leading to placement of children in foster care. Kadushin 366.   Other studies suggest, however, that neglect, abuse, abandonment and exploitation of children, which presumably account for most of the children who enter foster care by court order, see *infra*, at 828, are also involved in many cases of voluntary placement.   See *infra*, at 834; Kadushin 366.

[11] "Authorized agency" is defined in N. Y. Soc. Serv. Law § 371 (10) (McKinney 1976) and "includes any local public welfare children's bureau, such as the defendants New York City Bureau of Child Welfare and Nassau County Children's Bureau, and any voluntary child-care agency under the supervision of the New York State Board of Social Welfare, such as the defendant Catholic Guardian Society of New York."   418 F. Supp., at 278 n. 5.

An *amicus curiae* brief states that in New York City, 85% of the children in foster care are placed with voluntary child-care agencies licensed by the State, while most children in foster care outside New York City are placed directly with the local Department of Social Services.   Brief for Legal Aid Society of City of New York, Juvenile Rights Division, as *Amicus Curiae* 14 n. 22.

[12] Before enactment of § 384–a in 1975, the natural parent who had voluntarily placed a child in foster care had no automatic right to return

The agency may maintain the child in an institutional setting, §§ 374–b, 374–c, 374–d (McKinney 1976), but more commonly acts under its authority to "place out and board out" children in foster homes. § 374 (1).[13] Foster parents, who are licensed by the State or an authorized foster-care agency, §§ 376, 377, provide care under a contractual arrangement with the agency, and are compensated for their services. See 18 N. Y. C. R. R. §§ 606.2, 606.6 (1977); App. 76a, 81a. The typical contract expressly reserves the right of the agency to remove the child on request. 418 F. Supp., at 281; App. 76a, 79a. See N. Y. Soc. Serv. Law § 383 (2) (McKinney 1976).[14] Conversely, the foster parent may cancel the agreement at will.[15]

The New York system divides parental functions among agency, foster parents, and natural parents, and the definitions of the respective roles are often complex and often unclear.[16]

of the child. If the agency refused consent for the return of the child to the parent, the parent's only remedy was to seek a writ of habeas corpus. N. Y. Civ. Prac. Law § 7001 et seq. (McKinney 1963); N. Y. Family Court Act § 651 (McKinney 1975). When the parent did not invoke this remedy, the child would remain in foster care. See Weiss & Chase, supra, n. 10, at 326–327, 333–334.

[13] The record indicates that at the end of 1973, of 48,812 children in foster care under the supervision of the New York State Board of Social Welfare and the New York State Department of Social Services, 35,287 (about 72%) were placed in foster family homes, and the rest in institutions or other facilities. App. 117a.

[14] Such contractual provisions are apparently also characteristic of foster-care arrangements in other States. See, e. g., Mnookin I 610.

[15] See, e. g., the case of appellees Ralph and Christiane Goldberg, n. 1, supra. Evidence in the record indicates that as many as one-third of all transfers within the foster-care system are at the request of the foster parents. Affidavit of Carol J. Parry, App. 90a.

[16] The resulting confusion not only produces anomalous legal relationships but also affects the child's emotional status. The foster child's loyalties, emotional involvements, and responsibilities are often divided among three adult authority figures—the natural parents, the foster parent, and the social worker representing the foster-care agency. See,

The law transfers "care and custody" to the agency, § 384–a; see also § 383 (2), but day-to-day supervision of the child and his activities, and most of the functions ordinarily associated with legal custody, are the responsibility of the foster parent.[17] Nevertheless, agency supervision of the performance of the foster parents takes forms indicating that the foster parent does not have the full authority of a legal custodian.[18] Moreover, the natural parent's placement of the child with the agency does not surrender legal guardianship;[19] the parent

---

e. g., Kadushin 387–389; see also Mnookin I 624; Wald, State Intervention on Behalf of "Neglected" Children: Standards for Removal of Children from Their Homes, Monitoring the Status of Children in Foster Care, and Termination of Parental Rights, 28 Stan. L. Rev. 623, 645 (1976) (hereafter Wald); E. Weinstein, The Self-Image of the Foster Child 15 (1960).

[17] "Legal custody is concerned with the rights and duties of the person (usually the parent) having custody to provide for the child's daily needs— to feed him, clothe him, provide shelter, put him to bed, send him to school, see that he washes his face and brushes his teeth." Kadushin 354–355. Obviously, performance of these functions directly by a state agency is impractical.

[18] "The agency sets limits and advances directives as to how the foster parents are to behave toward the child—a situation not normally encountered by natural parents. The shared control and responsibility for the child is clearly set forth in the instruction pamphlets issued to foster parents." Id., at 394. Agencies frequently prohibit corporal punishment; require that children over a certain age be given an allowance; forbid changes in the child's sleeping arrangements or vacations out of State without agency approval; require the foster parent to discuss the child's behavioral problems with the agency. Id., at 394–395. Furthermore, since the cost of supporting the child is borne by the agency, the responsibility, as well as the authority, of the foster parent is shared with the agency. Ibid.

[19] Voluntary placement in foster care is entirely distinct from the "surrender" of both "the guardianship of the person and the custody" of a child under Soc. Serv. Law § 384, which frees the child for adoption. § 384 (2). "Adoption is the legal proceeding whereby a person takes another person into the legal relation of child and thereby acquires the rights and incurs the responsibilities of parent in respect of such other

retains authority to act with respect to the child in certain circumstances.[20] The natural parent has not only the right but the obligation to visit the foster child and plan for his future; failure of a parent with capacity to fulfill the obligation for more than a year can result in a court order terminating the parent's rights on the ground of neglect. §§ 384–b (4), (7). See also § 384–b (5); N. Y. Dom. Rel. Law § 111 (McKinney Supp. 1976–1977); N. Y. Family Court Act § 611 (McKinney Supp. 1976–1977).[21]

Children may also enter foster care by court order. The Family Court may order that a child be placed in the custody of an authorized child-care agency after a full adversary judicial hearing under Art. 10 of the New York Family Court Act, if it is found that the child has been abused or neglected by his natural parents. §§ 1052, 1055. In addition, a minor adjudicated a juvenile delinquent, or "person in need of supervision" may be placed by the court with an agency. §§ 753, 754, 756. The consequences of foster-care placement by court order do not differ substantially from those for children voluntarily placed, except that the parent is not entitled to return of the child on demand pursuant to Soc. Serv. Law § 384–a (2) (a); termination of foster care must then be consented to by the court. § 383 (1).[22]

person." N. Y. Dom. Rel. Law § 110 (McKinney 1964). A child may also be freed for adoption by abandonment or consent. § 111 (McKinney Supp. 1976–1977); Soc. Serv. Law § 384–b.

[20] "[A]lthough the agency usually obtains legal custody in foster family care, the child still legally 'belongs' to the parent and the parent retains guardianship. This means that, for some crucial aspects of the child's life, the agency has no authority to act. Only the parent can consent to surgery for the child, or consent to his marriage, or permit his enlistment in the armed forces, or represent him at law." Kadushin 355. But see Soc. Serv. Law § 383–b.

[21] The agreement transferring custody to the agency must inform the parent of these obligations. §§ 384–a (2) (c) (iii), (iv).

[22] The Family Court is also empowered permanently to sever the ties

## B

The provisions of the scheme specifically at issue in this litigation come into play when the agency having legal custody determines to remove the foster child from the foster home, either because it has determined that it would be in the child's best interests to transfer him to some other foster home, or to return the child to his natural parents in accordance with the statute or placement agreement. Most children are removed in order to be transferred to another foster home.[23] The procedures by which foster parents may challenge a removal made for that purpose differ somewhat from those where the removal is made to return the child to his natural parent.

Section 383 (2), n. 3, *supra*, provides that the "authorized agency placing out or boarding [a foster] child . . . may in its discretion remove such child from the home where placed or boarded." Administrative regulations implement this provision. The agency is required, except in emergencies, to notify the foster parents in writing 10 days in advance of any removal. 18 N. Y. C. R. R. § 450.10 (a) (1976).[24] The notice advises the foster parents that if they object to the child's removal they may request a "conference" with the Social Services Department. *Ibid.* The department schedules requested conferences within 10 days of the receipt of the request. § 450.10 (b). The foster parent may appear with counsel at the conference, where he will "be advised of the

---

of parent and child if the parent fails to maintain contact with the child while in foster care. § 384–b (4)–(7). See *supra*, at 828, and n. 21.

[23] The record shows that in 1973–1974 approximately 80% of the children removed from foster homes in New York State after living in the foster home for one year or more were transferred to another foster placement. Thirteen percent were returned to the biological parents, and 7% were adopted. Tr. of Oral Arg. 34; Brief for Appellees 20.

[24] This regulation, set out in full in n. 3, *supra*, was formerly numbered 18 N. Y. C. R. R. § 450.14, and is referred to by that number in the opinion of the District Court.

reasons [for the removal of the child] and be afforded an opportunity to submit reasons why the child should not be removed." § 450.10 (a).[25]  The official must render a decision in writing within five days after the close of the conference, and send notice of his decision to the foster parents and the agency. § 450.10 (c).  The proposed removal is stayed pending the outcome of the conference. § 450.10 (d).

If the child is removed after the conference, the foster parent may appeal to the Department of Social Services for a "fair hearing," that is, a full adversary administrative hearing, under Soc. Serv. Law § 400,[26] the determination of which is subject to judicial review under N. Y. Civ. Prac. Law § 7801 et seq. (McKinney 1963); however, the removal is not automatically stayed pending the hearing and judicial review.[27]

This statutory and regulatory scheme applies statewide.[28]

---

[25] The State argues that while § 450.10 provides minimum requirements for notice to the foster family of the agency's intention to remove the child and the reasons for that decision, the close contact between the agency and the foster parent insures that in most circumstances the foster parent is informed well in advance of any projected removal. In fact, 18 N. Y. C. R. R. § 606.16 (1976) requires the agency in some circumstances to begin for the discharge of the children from foster care, in cooperation with all parties involved, as early as six months in advance. Brief for Appellants in No. 76–183, pp. 21–23.

[26] This statute is set out in full in n. 3, supra.

[27] A court, however, apparently may grant a stay in some circumstances. See, e. g., In re W., 77 Misc. 2d 374, 377, 355 N. Y. S. 2d 245, 249 (1974).

[28] There is some dispute whether the procedures set out in 18 N. Y. C. R. R. § 450.10 and Soc. Serv. Law § 400 apply in the case of a foster child being removed from his foster home to be returned to his natural parents. Application of these procedures to children who have been placed voluntarily, for example, arguably conflicts with the requirement of § 384–a (2) (a) that children in that situation be returned to the natural parent as provided in the placement agreement or within 20 days of demand. Similarly, if the child has been ordered returned by a court, it is unclear what purpose could be served by an administrative conference or hearing on the correctness of the decision to remove the child

In addition, regulations promulgated by the New York City Human Resources Administration, Department of Social Services—Special Services for Children (SSC) provide even greater procedural safeguards there. Under SSC Procedure No. 5 (Aug. 5, 1974), in place of or in addition to the conference provided by the state regulations, the foster parents may request a full trial-type hearing *before* the child is removed from their home. This procedure applies, however, only if the child is being transferred to another foster home, and not if the child is being returned to his natural parents.[29]

One further preremoval procedural safeguard is available. Under Soc. Serv. Law § 392, the Family Court has jurisdiction to review, on petition of the foster parent or the agency, the status of any child who has been in foster care for 18 months or longer.[30] The foster parents, the natural parents, and all

from the foster home. Moreover, since the § 400 hearing takes place after removal of the child from the foster home, the hearing would have no purpose if the child has been returned to its parents, since the agency apparently has no authority to take the child back from its parents against their will without court intervention.

Nevertheless, nothing in either the statute or the regulations limits the availability of these procedures to transfers within the foster-care system. Each refers to the decision to *remove* a child from the foster family home, and thus on its face each would seem to cover removal for the purpose of returning the child to its parents. Furthermore, it is undisputed on this record that the actual administrative practice in New York is to provide the conference and hearing in all cases where they are requested, regardless of the destination of the child. In the absence of authoritative state-court interpretation to the contrary, we therefore assume that these procedures are available whenever a child is removed from a foster family home.

[29] SSC Procedure No. 5 is set out in full in App. to Brief for Appellants in No. 76–5193, pp. 54a–65a, and in Jurisdictional Statement of New York City Appellants A8.

[30] The agency is required to initiate such a review when a child has remained in foster care for 18 months, § 392 (2) (a), and if the child remains in foster care, the court "shall rehear the matter whenever it

interested agencies are made parties to the proceeding. § 392 (4). After hearing, the court may order that foster care be continued, or that the child be returned to his natural parents, or that the agency take steps to free the child for adoption.[31] § 392 (7). Moreover, § 392 (8) authorizes the court to issue an "order of protection" which "may set forth reasonable conditions of behavior to be observed for a specified time by a person or agency who is before the court." Thus, the court may order not only that foster care be continued, but additionally, "in assistance or as a condition of" that order, that the agency leave the child with the present foster parent.[32] In other words, § 392 provides a mechanism whereby a foster parent may obtain preremoval judicial review of an agency's decision to remove a child who has been in foster care for 18 months or more.

---

deems necessary or desirable, or upon petition by any party entitled to notice in proceedings under this section, but at least every twenty-four months." § 392 (10).

[31] If the agency already has guardianship as well as custody of the foster child, as in the case of a surrender or previous court order terminating the guardianship of the natural parent for neglect, see nn. 19, 22, *supra,* the court may simply order that the child be placed for adoption, § 392 (7)(d); if the agency does not have guardianship, as in the case of children placed in foster care temporarily either by court order or by voluntary placement, the court may direct the agency to initiate a proceeding to free the child for adoption under §§ 384–b, 392 (7)(c).

[32] Both the District Court, 418 F. Supp., at 284, and the appellees, Brief for Appellees 70–72, argue that § 392 does not permit the court to enter such an order, citing *In re W., supra,* at 376, 355 N. Y. S. 2d, at 248. But in that very case, the court ordered that the child remain with the foster family pending exhaustion of the remedies provided by § 400, thus essentially converting that hearing into a preremoval remedy. See n. 27, *supra.* Moreover, other courts have granted such relief. *In re S.,* 74 Misc. 2d 935, 347 N. Y. S. 2d 274 (1973). See also *In re Denlow,* 87 Misc. 2d 410, 384 N. Y. S. 2d 621 (1976); *In re H.,* 80 Misc. 2d 593, 363 N. Y. S. 2d 73 (1974). This interpretation of the power of the court seems to be fully supported by the broad language of § 392 (7).

## C

Foster care of children is a sensitive and emotion-laden subject, and foster-care programs consequently stir strong controversy. The New York regulatory scheme is no exception. New York would have us view the scheme as described in its brief:

"Today New York premises its foster care system on the accepted principle that the placement of a child into foster care is solely a temporary, transitional action intended to lead to the future reunion of the child with his natural parent or parents, or if such a reunion is not possible, to legal adoption and the establishment of a new permanent home for the child." Brief for Appellants in No. 76–183, p. 3.

Some of the parties and *amici* argue that this is a misleadingly idealized picture. They contend that a very different perspective is revealed by the empirical criticism of the system presented in the record of this case and confirmed by published studies of foster care.

From the standpoint of natural parents, such as the appellant intervenors here, foster care has been condemned as a class-based intrusion into the family life of the poor. See, *e. g.*, Jenkins, Child Welfare as a Class System, in Children and Decent People 3 (A. Schorr ed. 1974). And see generally tenBroek, California's Dual System of Family Law: Its Origins, Development and Present Status (pt. I), 16 Stan. L. Rev. 257 (1964); (pt. II), 16 Stan. L. Rev. 900 (1964); (pt. III), 17 Stan. L. Rev. 614 (1965). It is certainly true that the poor resort to foster care more often than other citizens. For example, over 50% of all children in foster care in New York City are from female-headed families receiving Aid to Families with Dependent Children. Foundation for Child Development, State of the Child: New York City 61 (1976). Minority families are also more likely to turn to fos-

ter care; 52.3% of the children in foster care in New York City are black and 25.5% are Puerto Rican. Child Welfare Information Services, Characteristics of Children in Foster Care, New York City Reports, Table No. 2 (Dec. 31, 1976).[33] This disproportionate resort to foster care by the poor and victims of discrimination doubtless reflects in part the greater likelihood of disruption of poverty-stricken families. Commentators have also noted, however, that middle- and upper-income families who need temporary care services for their children have the resources to purchase private care. See, e. g., Rein, Nutt, & Weiss 24, 25. The poor have little choice but to submit to state-supervised child care when family crises strike. *Id.,* at 34.

The extent to which supposedly "voluntary" placements are in fact voluntary has been questioned on other grounds as well. For example, it has been said that many "voluntary" placements are in fact coerced by threat of neglect proceedings [34] and are not in fact voluntary in the sense of the product of an informed consent. Mnookin I 599, 601. Studies also suggest that social workers of middle-class backgrounds, perhaps unconsciously, incline to favor continued placement in foster care with a generally higher-status family rather than return the child to his natural family, thus reflecting a bias that treats the natural parents' poverty and lifestyle as prejudicial to the best interests of the child. Rein, Nutt, & Weiss 42–44; Levine, Caveat Parens: A Demystification of the Child Protection System, 35 U. Pitt. L. Rev. 1, 29 (1973). This accounts,[35] it has been said, for the hostility of agencies to the

---

[33] For further comment on this point, see Jenkins, Child Welfare as a Class System, in Children and Decent People 3, 11–12 (A. Schorr ed. 1974); Rein, Nutt, & Weiss, Foster Family Care: Myth and Reality, in Children and Decent People 24, 25–29 (A. Schorr ed. 1974) (hereafter Rein, Nutt, & Weiss).

[34] See, e. g., the case of Rafael Serrano, the foster child of appellees Ralph and Christiane Goldberg, n. 1, *supra.*

[35] Other factors alleged to bias agencies in favor of retention in foster

efforts of natural parents to obtain the return of their children.[36]

Appellee foster parents as well as natural parents question the accuracy of the idealized picture portrayed by New York. They note that children often stay in "temporary" foster care for much longer than contemplated by the theory of the system. See, *e. g.*, Kadushin 411–412; Mnookin I 610–613; Wald 662–663; Rein, Nutt, & Weiss 37–39.[37] The

---

care are the lack of sufficient staff to provide social work services needed by the natural parents to resolve their problems and prepare for return of the child; policies of many agencies to discourage involvement of the natural parents in the care of the child while in foster care; and systems of foster-care funding that encourage agencies to keep the child in foster care. Wald 677–679. See also E. Sherman, R. Neuman, & A. Shyne, Children Adrift in Foster Care: A Study of Alternative Approaches 4–5 (1973).

[36] For an example of this problem, see the case of intervenor Naomi Rodriguez, n. 5, *supra.*

Recent legislative reforms in New York that decrease agencies' discretion to retain a child in foster care are apparently designed to meet these objections. For example, Soc. Serv. Law § 384–a (2) (a) gives parents of children in voluntary foster placement greater rights to the return of their children. Since the statute permits placement agreements of varied terms, however, and since many children in foster care are not voluntarily placed, there may still be situations in which the agency has considerable discretion in deciding whether or not to return the child to the natural parent. The periodic court review provided by § 392 is also intended in part to meet these objections, but critics of foster care have argued that given the heavy caseloads, such review may often be perfunctory. Mnookin, Child-Custody Adjudication: Judicial Functions in the Face of Indeterminacy, 39 (3) Law & Contemp. Probs. 226, 274–275 (1975) (hereafter Mnookin II). Moreover, judges too may find it difficult, in utilizing vague standards like "the best interests of the child," to avoid decisions resting on subjective values.

[37] The New York Legislature has recognized the merit of this criticism. Social Serv. Law § 384–b (1) (b), adopted in 1976, states:

"The legislature further finds that many children who have been placed in foster care experience unnecessarily protracted stays in such care without

District Court found as a fact that the median time spent in foster care in New York was over four years. 418 F. Supp., at 281. Indeed, many children apparently remain in this "limbo" indefinitely. Mnookin II 226, 273. The District Court also found that the longer a child remains in foster care, the more likely it is that he will never leave: "[T]he probability of a foster child being returned to his biological parents declined markedly after the first year in foster care." 418 F. Supp., at 279 n. 6. See also E. Sherman, R. Neuman, & A. Shyne, Children Adrift in Foster Care: A Study of Alternative Approaches 3 (1973); Fanshel, The Exit of Children from Foster Care: An Interim Research Report, 50 Child Welfare 65, 67 (1971). It is not surprising then that many children, particularly those that enter foster care at a very early age [38] and have little or no contact with their natural parents during extended stays in foster care,[39] often develop deep emotional ties with their foster parents.[40]

---

being adopted or returned to their parents or other custodians. Such unnecessary stays may deprive these children of positive, nurturing family relationships and have deleterious effects on their development into responsible, productive citizens."

[38] In New York City, 23.1% of foster children enter foster care when under one year of age, and 43% at age three or under. Child Welfare Information Services, supra, n. 9, Table No. 5. Cf. E. Sherman, R. Neuman, & A. Shyne, supra, at 24 (18% of foster-care children in Rhode Island study were under one year of age when they entered foster care, and 43% were under the age of three).

[39] One study of parental contacts in New York City found that 57.4% of all foster children had had no contact with their natural parents for the previous six months. Child Welfare Information Services, Parental Visiting Information, New York City Reports, Table No. 1 (Dec. 31, 1976).

[40] The development of such ties points up an intrinsic ambiguity of foster care that is central to this case. The warmer and more homelike environment of foster care is intended to be its main advantage over institutional child care, yet because in theory foster care is intended to be only temporary, foster parents are urged not be become too attached

Yet such ties do not seem to be regarded as obstacles to transfer of the child from one foster placement to another. The record in this case indicates that nearly 60% of the children in foster care in New York City have experienced more than one placement, and about 28% have experienced three or more. App. 189a. See also Wald 645–646; Mnookin I 625–626. The intended stability of the foster-home management is further damaged by the rapid turnover among social work professionals who supervise the foster-care arrangements on behalf of the State. *Id.*, at 625; Rein, Nutt, & Weiss 41; Kadushin 420. Moreover, even when it is clear that a foster child will not be returned to his natural parents, it is rare that he achieves a stable home life through final termination of parental ties and adoption into a new permanent family. Fanshel, Status Changes of Children in Foster Care: Final

to the children in their care. Mnookin I 613. Indeed, the New York courts have upheld removal from a foster home for the very reason that the foster parents had become too emotionally involved with the child. *In re Jewish Child Care Assn. (Sanders)*, 5 N. Y. 2d 222, 156 N. E. 2d 700 (1959). See also the case of the Lhotans, named appellees in this case, n. 1, *supra*.

On the other hand, too warm a relation between foster parent and foster child is not the only possible problem in foster care. Qualified foster parents are hard to find, Kadushin 367–372, 415–417, and very little training is provided to equip them to handle the often complicated demands of their role, Rein, Nutt, & Weiss 44–45; it is thus sometimes possible that foster homes may provide inadequate care. Indeed, situations in which foster children were mistreated or abused have been reported. Wald 645. And the social work services that are supposed to be delivered to both the natural and foster families are often limited, due to the heavy caseloads of the agencies. Kadushin 413; Mnookin II 274. Given these problems, and given that the very fact of removal from even an inadequate natural family is often traumatic for the child, Wald 644–645, it is not surprising that one commentator has found "rather persuasive, if still incomplete, evidence that throughout the United States, children in foster care are experiencing high rates of psychiatric disturbance." Eisenberg, The Sins of the Fathers: Urban Decay and Social Pathology, 32 Am. J. of Orthopsychiatry 5, 14 (1962).

Results of the Columbia University Longitudinal Study, 55 Child Welfare 143, 145, 157 (1976); Mnookin II 275–277; Mnookin I 612–613. See also n. 23, *supra*.

The parties and *amici* devote much of their discussion to these criticisms of foster care, and we present this summary in the view that some understanding of those criticisms is necessary for a full appreciation of the complex and controversial system with which this lawsuit is concerned.[41] But the issue presented by the case is a narrow one. Arguments asserting the need for reform of New York's statutory scheme are properly addressed to the New York Legislature. The relief sought in this case is entirely procedural. Our task is only to determine whether the District Court correctly held that the present procedures preceding the removal from a foster home of children resident there a year or more are constitutionally inadequate. To that task we now turn.

## II

### A

Our first inquiry is whether appellees have asserted interests within the Fourteenth Amendment's protection of

---

[41] It must be noted, however, that both appellee foster parents and intervening natural parents present incomplete pictures of the foster-care system. Although seeking relief applicable to all removal situations, the foster parents focus on intra-foster-care transfers, portraying a foster-care system in which children neglected by their parents and condemned to a permanent limbo of foster care are arbitrarily shunted about by social workers whenever they become attached to a foster home. The natural parents, who focus on foster children being returned to their parents, portray a system under which poor and minority parents, deprived of their children under hard necessity and bureaucratic pressures, are obstructed in their efforts to maintain relationships with their children and ultimately to regain custody, by hostile agencies and meddling foster parents. As the experiences of the named parties to this suit, nn. 1, 5, *supra*, and the critical studies of foster care cited, *supra*, at 833–838, demonstrate, there are elements of truth in both pictures. But neither represents the whole truth about the system.

"liberty" and "property." *Board of Regents* v. *Roth,* 408 U. S. 564, 571 (1972).

The appellees have not renewed in this Court their contention, rejected by the District Court, 418 F. Supp., at 280–281, that the realities of the foster-care system in New York gave them a justified expectation amounting to a "property" interest that their status as foster parents would be continued.[42] Our inquiry is therefore narrowed to the question whether their asserted interests are within the "liberty" protected by the Fourteenth Amendment.

The appellees' basic contention is that when a child has lived in a foster home for a year or more, a psychological tie is created between the child and the foster parents which constitutes the foster family the true "psychological family" of the child. See J. Goldstein, A. Freud, & A. Solnit, Beyond the Best Interests of the Child (1973). That family, they argue, has a "liberty interest" in its survival as a family protected by the Fourteenth Amendment. Cf. *Moore* v. *East Cleveland, ante,* p. 494. Upon this premise they conclude that the foster child cannot be removed without a prior hearing satisfying due process. Appointed counsel for the children, appellants in No. 76–5200, however, disagrees, and has consistently argued that the foster parents have no such liberty interest independent of the interests of the foster children, and that the best interests of the children would not be served by procedural protections beyond those already provided by New York law. The intervening natural parents of children in foster care, appellants in No. 76–5193, also oppose the foster parents, arguing that recognition of the procedural right claimed would undercut both the substantive family law of New York, which favors the return of children to their natural parents as expeditiously as possible, see *supra,* at 823,

---

[42] Appellees have also apparently abandoned their claim that the challenged procedures violate the Equal Protection Clause of the Fourteenth Amendment.

and their constitutionally protected right of family privacy, by forcing them to submit to a hearing and defend their rights to their children before the children could be returned to them.

The District Court did not reach appellees' contention "that the foster home is entitled to the same constitutional deference as that long granted to the more traditional biological family." 418 F. Supp., at 281. Rather than "reach[ing] out to decide such novel questions," the court based its holding that "the pre-removal procedures presently employed by the state are constitutionally defective," *id.*, at 282, not on the recognized liberty interest in family privacy, but on an independent right of the foster child "to be heard before being 'condemned to suffer grievous loss,' *Joint Anti-Fascist Committee v. McGrath,* 341 U. S. 123, 168 . . . (1951) (Frankfurter, J., concurring)." *Ibid.*

The court apparently reached this conclusion by weighing the "harmful consequences of a precipitous and perhaps improvident decision to remove a child from his foster family," *id.*, at 283, and concluding that this disruption of the stable relationships needed by the child might constitute "grievous loss." But if this was the reasoning applied by the District Court, it must be rejected.[43] *Meachum v. Fano,* 427 U. S. 215, 224 (1976), is authority that such a finding does not, in and of itself, implicate the due process guarantee. What was said in *Board of Regents v. Roth, supra,* at 570–571, applies equally well here:

"The District Court decided that procedural due process guarantees apply in this case by assessing and balancing

---

[43] The dissenting judge argued that the court's underlying premise was a holding "over the objection of the representative of the children . . . that the foster children have a 'liberty' interest in their relationship with the foster parents." 418 F. Supp., at 288. If this was in fact the reasoning of the District Court, we do not see how it differs from a holding that the foster family relationship is entitled to privacy protection analogous to the natural family—the issue the District Court purported not to reach.

the weights of the particular interests involved. . . .
[A] weighing process has long been a part of any deter-
mination of the *form* of hearing required in particular
situations by procedural due process.   But, to determine
whether due process requirements apply in the first place,
we must look not to the 'weight' but to the *nature* of
the interest at stake. . . .   We must look to see if the
interest is within the Fourteenth Amendment's protec-
tion of liberty and property." [44]

---

[44] Appellants argue, with the dissenting judge below, *id.*, at 288, that
in any event appellee foster parents have no standing to rely upon a
supposed right of the foster *children* to avoid "grievous loss," because the
foster children are independently represented by court-appointed counsel,
who has consistently opposed the relief requested by appellees, and denied
that the children have any such right.

This argument misunderstands the peculiar circumstances of this lawsuit.
Ordinarily, it is true, a party would not have standing to assert the rights
of another, himself a party in the litigation; the third party himself can
decide how best to protect his interests.   But children usually lack the
capacity to make that sort of decision, and thus their interest is ordinarily
represented in litigation by parents or guardians.   In this case, however,
the State, the natural parents, and the foster parents, all of whom share
some portion of the responsibility for guardianship of the child, see *supra,*
at 826–828, and nn. 16–18, are parties, and all contend that the position
they advocate is most in accord with the rights and interests of the
children.   In this situation, the District Court properly appointed inde-
pendent counsel to represent the children, so that the court could have the
benefit of an independent advocate for the welfare of the children, un-
prejudiced by the possibly conflicting interests and desires of the other
parties.   It does not follow, however, that that independent counsel, who
is not a guardian *ad litem* of the children, is solely authorized to deter-
mine the children's best interest.

No party denies, or could deny, that there is an Art. III "case or
controversy" between the foster parents and the defendant state officials
concerning the validity of the removal procedures.   Accordingly, their
standing to raise the rights of the children in their attack on those
procedures is a prudential question.   *Craig* v. *Boren,* 429 U. S. 190, 193
(1976).   We believe it would be most imprudent to leave entirely to
court-appointed counsel the choices that neither the named foster children

We therefore turn to appellees' assertion that they have a constitutionally protected liberty interest—in the words of the District Court, a "right to familial privacy," 418 F. Supp., at 279—in the integrity of their family unit.[45] This assertion clearly presents difficulties.

## B

It is, of course, true that "freedom of personal choice in matters of . . . family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment." *Cleveland Board of Education* v. *LaFleur,* 414 U. S. 632, 639–640 (1974). There does exist a "private realm of family life which the state cannot enter," *Prince* v. *Massachusetts,* 321 U. S. 158, 166 (1944), that has been afforded both substantive[46] and procedural[47] protection. But is the relation of foster parent to foster child sufficiently akin to the concept of "family" recognized in our precedents to merit similar protection?[48] Although considerable difficulty has attended the task of defining "family" for purposes of the Due Process

nor the class they represent are capable of making for themselves, especially in litigation in which all parties have sufficient attributes of guardianship that their views on the rights of the children should at least be heard.

[45] There can be, of course, no doubt of appellees' standing to assert this interest, which, to whatever extent it exists, belongs to the foster parents as much as to the foster children.

[46] *Moore* v. *East Cleveland, ante,* p. 494 (plurality opinion); *Roe* v. *Wade,* 410 U. S. 113, 152–153 (1973); *Wisconsin* v. *Yoder,* 406 U. S. 205, 231–233 (1972); *Griswold* v. *Connecticut,* 381 U. S. 479 (1965); *id.,* at 495–496 (Goldberg, J., concurring); *id.,* at 502–503 (WHITE, J., concurring in judgment); *Pierce* v. *Society of Sisters,* 268 U. S. 510, 534–535 (1925); *Meyer* v. *Nebraska,* 262 U. S. 390, 399–401 (1923).

[47] See, *e. g., Stanley* v. *Illinois,* 405 U. S. 645, 651 (1972); *Cleveland Board of Education* v. *LaFleur,* 414 U. S. 632 (1974); *Armstrong* v. *Manzo,* 380 U. S. 545 (1965); *May* v. *Anderson,* 345 U. S. 528 (1953).

[48] Of course, recognition of a liberty interest in foster families for purposes of the procedural protections of the Due Process Clause would not necessarily require that foster families be treated as fully equivalent to

Clause, see *Moore* v. *East Cleveland, ante,* pp. 494 (plurality opinion of POWELL, J.), 531 (STEWART, J., dissenting), 541 (WHITE, J., dissenting), we are not without guides to some of the elements that define the concept of "family" and contribute to its place in our society.

First, the usual understanding of "family" implies biological relationships, and most decisions treating the relation between parent and child have stressed this element. *Stanley* v. *Illinois,* 405 U. S. 645, 651 (1972), for example, spoke of "[t]he rights to conceive and to raise one's children" as essential rights, citing *Meyer* v. *Nebraska,* 262 U. S. 390 (1923), and *Skinner* v. *Oklahoma ex rel. Williamson,* 316 U. S. 535 (1942). And *Prince* v. *Massachusetts,* stated:

> "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." 321 U. S., at 166.[49]

A biological relationship is not present in the case of the usual foster family. But biological relationships are not exclusive determination of the existence of a family.[50] The basic foundation of the family in our society, the marriage relationship, is of course not a matter of blood relation. Yet its importance has been strongly emphasized in our cases:

> "We deal with a right of privacy older than the Bill of Rights—older than our political parties, older than our school system. Marriage is a coming together for better

---

biological families for purposes of substantive due process review. Cf. *Moore* v. *East Cleveland, ante,* at 546–547 (WHITE, J., dissenting).

[49] The scope of these rights extends beyond natural parents. The "parent" in *Prince* itself, for example, was the child's aunt and legal custodian. 321 U. S., at 159. And see *Moore* v. *East Cleveland, ante,* at 504–506 (plurality opinion), 507–511 (BRENNAN, J., concurring).

[50] Some Justices of the Court have suggested that, at least where the substantive protection of the Due Process Clause is involved, biological

or for worse, hopefully enduring, and intimate to the degree of being sacred. It is an association that promotes a way of life, not causes; a harmony in living, not political faiths; a bilateral loyalty, not commercial or social projects. Yet it is an association for as noble a purpose as any involved in our prior decisions." *Griswold* v. *Connecticut,* 381 U. S. 479, 486 (1965).

See also *Loving* v. *Virginia,* 388 U. S. 1, 12 (1967).

Thus the importance of the familial relationship, to the individuals involved and to the society, stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in "promot[ing] a way of life" through the instruction of children, *Wisconsin* v. *Yoder,* 406 U. S. 205, 231–233 (1972), as well as from the fact of blood relationship. No one would seriously dispute that a deeply loving and interdependent relationship between an adult and a child in his or her care may exist even in the absence of blood relationship.[51] At least where a child has been placed in foster care as an infant, has never known his natural parents, and has remained continuously for several years in the care of the same foster parents, it is natural that the foster family should hold the same place in the emotional life of the foster child, and fulfill the same socializing functions, as a natural family.[52] For this reason, we cannot dismiss the foster family as a mere collection of unrelated indi-

---

relationship alone is not sufficient to create a constitutionally protected "family." *Moore* v. *East Cleveland, ante,* at 536–540 (STEWART, J., dissenting) 549 (WHITE, J., dissenting).

[51] Adoption, for example, is recognized as the legal equivalent of biological parenthood. See, *e. g.,* N. Y. Dom. Rel. Law § 110, *supra,* n. 19.

[52] The briefs dispute at some length the validity of the "psychological parent" theory propounded in J. Goldstein, A. Freud, & A. Solnit, Beyond the Best Interests of the Child (1973). That book, on which appellee foster parents relied to some extent in the District Court, is indeed controversial. See, *e. g.,* Strauss & Strauss, Book Review, 74 Colum. L. Rev. 996 (1974); Kadushin, Beyond the Best Interests of the Child: An Essay

viduals. Cf. *Village of Belle Terre* v. *Boraas,* 416 U. S. 1 (1974).

But there are also important distinctions between the foster family and the natural family. First, unlike the earlier cases recognizing a right to family privacy, the State here seeks to interfere, not with a relationship having its origins entirely apart from the power of the State, but rather with a foster family which has its source in state law and contractual arrangements. The individual's freedom to marry and reproduce is "older than the Bill of Rights," *Griswold* v. *Connecticut, supra,* at 486. Accordingly, unlike the property interests that are also protected by the Fourteenth Amendment, cf. *Board of Regents* v. *Roth,* 408 U. S., at 577, the liberty interest in family privacy has its source, and its contours are ordinarily to be sought, not in state law,[53] but in intrinsic human rights, as they have been understood in "this Nation's history and tradition." *Moore* v. *East Cleveland, ante,* at 503. Cf. also *Meachum* v. *Fano,* 427 U. S., at 230 (STEVENS, J., dissenting). Here, however, whatever emotional ties may develop between foster parent and foster child have their origins in an arrangement in which the State has been a partner from the outset. While the Court has recognized that liberty interests may in some cases arise from positive-law sources, see, *e. g., Wolff* v. *McDonnell,* 418 U. S. 539, 557 (1974), in such a case, and particularly where, as here, the claimed interest derives from a knowingly assumed contractual relation with the State, it is appropriate to ascer-

Review, 48 Soc. Serv. Rev. 508, 512 (1974). But this case turns, not on the disputed validity of any particular psychological theory, but on the legal consequences of the undisputed fact that the emotional ties between foster parent and foster child are in many cases quite close, and undoubtedly in some as close as those existing in biological families.

[53] The legal status of families has never been regarded as controlling: "Nor has the [Constitution] refused to recognize those family relationships unlegitimized by a marriage ceremony." *Stanley* v. *Illinois,* 405 U. S., at 651.

tain from state law the expectations and entitlements of the parties. In this case, the limited recognition accorded to the foster family by the New York statutes and the contracts executed by the foster parents argue against any but the most limited constitutional "liberty" in the foster family.

A second consideration related to this is that ordinarily procedural protection may be afforded to a liberty interest of one person without derogating from the substantive liberty of another. Here, however, such a tension is virtually unavoidable. Under New York law, the natural parent of a foster child in voluntary placement has an absolute right to the return of his child in the absence of a court order obtainable only upon compliance with rigorous substantive and procedural standards, which reflect the constitutional protection accorded the natural family. See nn. 46, 47, *supra*. Moreover, the natural parent initially gave up his child to the State only on the express understanding that the child would be returned in those circumstances. These rights are difficult to reconcile with the liberty interest in the foster family relationship claimed by appellees. It is one thing to say that individuals may acquire a liberty interest against arbitrary governmental interference in the family-like associations into which they have freely entered, even in the absence of biological connection or state-law recognition of the relationship. It is quite another to say that one may acquire such an interest in the face of another's constitutionally recognized liberty interest that derives from blood relationship, state-law sanction, and basic human right—an interest the foster parent has recognized by contract from the outset.[54] Whatever liberty interest might otherwise exist in the

---

[54] The New York Court of Appeals has as a matter of state law "[p]articularly rejected . . . the notion . . . that third-party custodians may acquire some sort of squatter's rights in another's child." *Bennett* v. *Jeffreys*, 40 N. Y. 2d 543, 552 n. 2, 356 N. E. 2d 277, 285 n. 2 (1976).

foster family as an institution, that interest must be substantially attenuated where the proposed removal from the foster family is to return the child to his natural parents.

As this discussion suggests, appellees' claim to a constitutionally protected liberty interest raises complex and novel questions. It is unnecessary for us to resolve those questions definitively in this case, however, for, like the District Court, we conclude that "narrower grounds exist to support" our reversal. We are persuaded that, even on the assumption that appellees have a protected "liberty interest," the District Court erred in holding that the preremoval procedures presently employed by the State are constitutionally defective.

## III

Where procedural due process must be afforded because a "liberty" or "property" interest is within the Fourteenth Amendment's protection, there must be determined "what process is due" in the particular context. The District Court did not spell out precisely what sort of preremoval hearing would be necessary to meet the constitutional standard, leaving to "the various defendants—state and local officials—the first opportunity to formulate procedures suitable to their own professional needs and compatible with the principles set forth in this opinion." 418 F. Supp., at 286. The court's opinion, however, would seem to require at a minimum that in all cases in which removal of a child within the certified class is contemplated, including the situation where the removal is for the purpose of returning the child to his natural parents, a hearing be held automatically, regardless of whether or not the foster parents request a hearing;[55] that the hearing be

---

[55] The judgment of the District Court contains a provision (see Jurisdictional Statements, Joint App. 36a, 37a), not suggested in the opinion, that "hearings need not be held when the foster child is to be removed . . . at the request of the foster parent." At oral argument, counsel for the foster parents stated that this limitation was the result of "a practical

before an officer who has had no previous contact with the decision to remove the child, and who has authority to order that the child remain with the foster parents; and that the agency, the foster parents, and the natural parents, as well as the child, if he is able intelligently to express his true feelings, and an independent representative of the child's interests, if he is not, be represented and permitted to introduce relevant evidence.

It is true that "[b]efore a person is deprived of a protected interest, he must be afforded opportunity for some kind of a hearing, 'except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event.'" *Board of Regents* v. *Roth,* 408 U. S., at 570 n. 7, quoting *Boddie* v. *Connecticut,* 401 U. S. 371, 379 (1971). But the hearing required is only one "appropriate to the nature of the case." *Mullane* v. *Central Hanover Bank & Trust Co.,* 339 U. S. 306, 313 (1950). See, *e. g., Bell* v. *Burson,* 402 U. S. 535, 542 (1971); *Goldberg* v. *Kelly,* 397 U. S. 254, 263 (1970); *Cafeteria Workers* v. *McElroy,* 367 U. S. 886, 895 (1961). "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey* v. *Brewer,* 408 U. S. 471, 481 (1972). Only last Term, the Court held that "identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional

---

consideration . . . . [I]f a foster parent feels that the child cannot stay with the foster parent any longer, it doesn't make sense to try and impose that. . . . [I]t's hard to contemplate a situation in which it would be in the best interest of a child to stay with people that had asked that the child be taken." Tr. of Oral Arg. 49. As many as one-third of transfers between foster homes may be at the request of the foster parents. N. 15, *supra.*

or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews* v. *Eldridge,* 424 U. S. 319, 335 (1976). Consideration of the procedures employed by the State and New York City in light of these three factors requires the conclusion that those procedures satisfy constitutional standards.

Turning first to the procedure applicable in New York City, SSC Procedure No. 5, see *supra,* at 831, and n. 29, provides that before a child is removed from a foster home for transfer to another foster home, the foster parents may request an "independent review." The District Court's description of this review is set out in the margin.[56] Such a procedure would appear to give a more elaborate trial-type hearing to foster families than this Court has found required in other contexts of administrative determinations. Cf. *Goldberg* v. *Kelly, supra,* at 266–271. The District Court found the procedure inadequate on four grounds, none of which we find sufficient to justify the holding that the procedure violates due process.

---

[56] "As of July 1, 1974, New York City has provided, at the foster parent's request, as a substitute for or supplement to the agency conference, a pre-removal 'independent review' conducted 'in accordance with the concepts of due process.' Its salient features, as set forth in an internal memorandum of August 5, 1974, are as follows: (1) the review is heard before a supervisory official who has had no previous involvement with the decision to remove the child; (2) both the foster parents and the agency may be represented by counsel and each may present witnesses and evidence; (3) all witnesses must be sworn, unless stipulated otherwise, and all testimony is subject to cross-examination; (4) counsel for the foster parents must be allowed to examine any portion of the agency's files used to support the proposal to remove the child; (5) either a tape recording or stenographic record of the hearing must be kept and made available to the parties at cost; and (6) a written decision, supported by reasons, must be rendered within five days and must include a reminder to the foster parents that they may still request a post-removal hearing under N. Y. C. R. R. § 450.14." 418 F. Supp., at 285.

First, the court held that the "independent review" administrative proceeding was insufficient because it was only available on the request of the foster parents. In the view of the District Court, the proceeding should be provided as a matter of course, because the interests of the foster parents and those of the child would not necessarily be coextensive, and it could not be assumed that the foster parents would invoke the hearing procedure in every case in which it was in the child's interest to have a hearing. Since the child is unable to request a hearing on his own, automatic review in every case is necessary. We disagree. As previously noted, the constitutional liberty, if any, sought to be protected by the New York procedures is a right of *family* privacy or autonomy, and the basis for recognition of any such interest in the foster family must be that close emotional ties analogous to those between parent and child are established when a child resides for a lengthy period with a foster family. If this is so, necessarily we should expect that the foster parents will seek to continue the relationship to preserve the stability of the family; if they do not request a hearing, it is difficult to see what right or interest of the foster child is protected by holding a hearing to determine whether removal would unduly impair his emotional attachments to a foster parent who does not care enough about the child to contest the removal.[57] Thus, consideration of the interest to be protected and the likelihood of erroneous deprivations,[58] the first two

---

[57] The District Court itself apparently relied on similar logic, in exempting in its judgment removals requested by foster parents from the mandatory hearing requirement. See n. 55, *supra*. In terms of the emotional cohesion of the family, the difference between a foster parent who requests removal of the foster child, and one who merely consents to removal seems irrelevant.

[58] In assessing the likelihood of erroneous decisions by the agency in the absence of elaborate hearing procedures, the fact that the agency bears primary responsibility for the welfare of the child, and maintains,

factors identified in *Mathews* v. *Eldridge, supra,* as appropriate in determining the sufficiency of procedural protections, do not support the District Court's imposition of this additional requirement. Moreover, automatic provision of hearings as required by the District Court would impose a substantial additional administrative burden on the State. According to appellant city officials, during the approximately two years between the institution of SSC Procedure No. 5 in August 1974 and June 1976, there were approximately 2,800 transfers per year in the city, but only 26 foster parents requested hearings. Brief for Appellants in No. 76–180, pp. 20–21. It is not at all clear what would be gained by requiring full hearings in the more than 5,500 cases in which they were not requested.

Second, the District Court faulted the city procedure on the ground that participation is limited to the foster parents and the agency, and the natural parent and the child are not made parties to the hearing. This is not fatal in light of the nature of the alleged constitutional interests at stake. When the child's transfer from one foster home to another is pending, the interest arguably requiring protection is that of the foster family, not that of the natural parents. Moreover, the natural parent can generally add little to the accuracy of factfinding concerning the wisdom of such a transfer, since the foster parents and the agency, through its caseworkers, will usually be most knowledgeable about conditions in the foster home. Of course, in those cases where the natural parent does have a special interest in the proposed transfer

---

through its caseworkers, constant contact with the foster family is relevant. The foster parent always has the opportunity to present information to the agency at this stage. We, of course, do not suggest that such informal "process" can ever do service for the fundamental requirements of due process. Cf. *In re Gault,* 387 U. S. 1 (1967). But it should not routinely be assumed that any decision made without the forms of adversary factfinding familiar to the legal profession is necessarily arbitrary or incorrect.

or particular information that would assist the factfinder, nothing in the city's procedure prevents any party from securing his testimony.

Much the same can be said in response to the District Court's statement:

> "[I]t may be advisable, under certain circumstances, for the agency to appoint an adult representative better to articulate the interests of the child. In making this determination, the agency should carefully consider the child's age, sophistication and ability effectively to communicate his own true feelings." 418 F. Supp., at 285–286.

But nothing in the New York City procedure prevents consultation of the child's wishes, directly or through an adult intermediary. We assume, moreover, that some such consultation would be among the first steps that a rational factfinder, inquiring into the child's best interests, would pursue. Such consultation, however, does not require that the child or an appointed representative must be a party with full adversary powers in all preremoval hearings.[59]

---

[59] Appointment of such representatives in each of the numerous cases in which the foster child is very young would, of course, represent a major administrative burden on the State. This burden would be balanced by little gain in accuracy of decisionmaking, since the appointed representative's inquiry into the best interests of the child would essentially duplicate that already conducted by the agency and that to be conducted at the hearing by the administrative decisionmaker.

Moreover, the State's interest in avoiding "fiscal and administrative burdens," *Mathews* v. *Eldridge,* 424 U. S. 319, 335 (1976), is not the only interest that must be weighed against requiring still more elaborate hearing procedures. As the District Court acknowledged, where delicate judgments concerning "the often ambiguous indices of a child's emotional attachments and psychological development" are involved, we must also consider the possibility that making the decisionmaking process increasingly adversary "might well impede the effort to elicit the sensitive and personal information required," 418 F. Supp., at 286, or make the struggle for

The other two defects in the city procedure found by the District Court must also be rejected. One is that the procedure does not extend to the removal of a child from foster care to be returned to his natural parent. But as we have already held, whatever liberty interest may be argued to exist in the foster family is significantly weaker in the case of removals preceding return to the natural parent, and the balance of due process interests must accordingly be different. If the city procedure is adequate where it is applicable, it is no criticism of the procedure that it does not apply in other situations where different interests are at stake. Similarly, the District Court pointed out that the New York City procedure coincided with the informal "conference" and postremoval hearings provided as a matter of state law. This overlap in procedures may be unnecessary or even to some degree unwise, see *id.,* at 285, but a State does not violate the Due Process Clause by providing alternative or additional procedures beyond what the Constitution requires.

Outside New York City, where only the statewide procedures apply, foster parents are provided not only with the procedures of a preremoval conference and postremoval hearing provided by 18 N. Y. C. R. R. § 450.10 (1976) and Soc. Serv. Law § 400 (McKinney 1976), see *supra,* at 829–830, but also with the preremoval *judicial* hearing available on request to foster parents who have in their care children who have been in foster care for 18 months or more, Soc. Serv. Law § 392. As observed *supra,* at 832, and n. 32, a foster parent in such case may obtain an order that the child remain in his care.

The District Court found three defects in this full judicial process. First, a § 392 proceeding is available only to those foster children who have been in foster care for 18 months or more. The class certified by the court was broader, including

custody, already often difficult for the child, see, *e. g.,* Kadushin 404, even more traumatic. In such a situation, there is a value in less formalized hearing procedures. See also n. 57, *supra.*

children who had been in the care of the same foster parents for more than one year. Thus, not all class members had access to the § 392 remedy.[60] We do not think that the 18-month limitation on § 392 actions renders the New York scheme constitutionally inadequate. The assumed liberty interest to be protected in this case is one rooted in the emotional attachments that develop over time between a child and the adults who care for him. But there is no reason to assume that those attachments ripen at less than 18 months or indeed at any precise point. Indeed, testimony in the record, see App. 177a, 204a, as well as material in published psychological texts, see, e. g., J. Goldstein, A. Freud, & A. Solnit, Beyond the Best Interests of the Child 40–42, 49 (1973), suggests that the amount of time necessary for the development of the sort of tie appellees seek to protect varies considerably depending on the age and previous attachments of the child. In a matter of such imprecision and delicacy, we see no justification for the District Court's substitution of its view of the appropriate cutoff date for that chosen by the New York Legislature, given that any line is likely to be somewhat arbitrary and fail to protect some families where relationships have developed quickly while protecting others where no such bonds have formed. If New York sees 18 months rather than 12 as the time at which temporary foster care begins to turn into a more permanent and family-like setting requiring procedural protection and/or judicial inquiry into the propriety of continuing foster care, it would take far more than this record

---

[60] Since the class certified by the District Court embraces all foster parents who have had a foster child living *with them* for over one year, while § 392 is limited in application to children in foster care for 18 months, each class includes some children not included in the other. For example, a child who had been in foster care for 13 months, all of it with the same family, is a member of the certified class but not eligible for § 392 review. On the other hand, a child who has been in foster care for two years but not with the same family, is eligible for § 392 review but is not a member of the certified class.

provides to justify a finding of constitutional infirmity in New York's choice.

The District Court's other two findings of infirmity in the § 392 procedure have already been considered and held to be without merit. The District Court disputed defendants' reading of § 392 as permitting an order requiring the leaving of the foster child in the same foster home. The plain words of the statute and the weight of New York judicial interpretation do not support the court. See *supra,* at 832, and n. 32. The District Court also faulted § 392, as it did the New York City procedure, in not providing an automatic hearing in every case even in cases where foster parents chose not to seek one. Our holding sustaining the adequacy of the city procedure, *supra,* at 850–851, applies in this context as well.[61]

Finally, the § 392 hearing is available to foster parents, both in and outside New York City, even where the removal sought is for the purpose of returning the child to his natural parents. Since this remedy provides a sufficient constitutional pre-removal hearing to protect whatever liberty interest might exist in the continued existence of the foster family when the State seeks to transfer the child to another foster home, *a fortiori* the procedure is adequate to protect the lesser interest of the foster family in remaining together at the expense of the disruption of the natural family.

We deal here with issues of unusual delicacy, in an area where professional judgments regarding desirable procedures are constantly and rapidly changing. In such a context, restraint is appropriate on the part of courts called upon to

---

[61] In this Court, as in the District Court, the primary reliance of the defendants and intervenors has been on the adequacy of § 392 as a procedure for protecting the interests of the foster family, without as fully addressing the adequacy otherwise of the procedures provided by 18 N. Y. C. R. R. § 450.10 and Soc. Serv. Law § 400. Our consequent emphasis upon the adequacy of § 392 procedures as requiring reversal of the District Court is not to be understood to imply any view upon the adequacy of the alternative administrative remedies to protect those interests.

adjudicate whether a particular procedural scheme is adequate under the Constitution. Since we hold that the procedures provided by New York State in § 392 and by New York City's SSC Procedure No. 5 are adequate to protect whatever liberty interests appellees may have, the judgment of the District Court is

*Reversed.*

MR. JUSTICE STEWART, with whom THE CHIEF JUSTICE and MR. JUSTICE REHNQUIST join, concurring in the judgment.

The foster parent-foster child relationship involved in this litigation is, of course, wholly a creation of the State. New York law defines the circumstances under which a child may be placed in foster care, prescribes the obligations of the foster parents, and provides for the removal of the child from the foster home "in [the] discretion" of the agency with custody of the child. N. Y. Soc. Serv. Law § 383 (2) (McKinney 1976). The agency compensates the foster parents, and reserves in its contracts the authority to decide as it sees fit whether and when a child shall be returned to his natural family or placed elsewhere. See Part I–A of the Court's opinion, *ante,* at 823–828. Were it not for the system of foster care that the State maintains, the relationship for which constitutional protection is asserted would not even exist.

The New York Legislature and the New York courts have made it unmistakably clear that foster care is intended only as a temporary way station until a child can be returned to his natural parents or placed for adoption. Thus, Soc. Serv. Law § 384–b (1) (b) (McKinney Supp. 1976–1977) states a legislative finding that "many children who have been placed in foster care experience unnecessarily protracted stays in such care without being adopted or returned to their parents or other custodians. Such unnecessary stays may deprive these children of positive, nurturing family relationships and have deleterious effects on their development into responsible, pro-

ductive citizens." And, specifically repudiating the contention that New York law contemplates that a child will have a "secure, stable and continuous" relationship with a third-party custodian as the child's "psychological parent," the New York Court of Appeals has "[p]articularly rejected the notion, if that it be, that third-party custodians may acquire some sort of squatter's rights in another's child." *Bennett* v. *Jeffreys*, 40 N. Y. 2d 543, 552 n. 2, 356 N. E. 2d 277, 285 n. 2.

In these circumstances, I cannot understand why the Court thinks itself obliged to decide these cases on the assumption that either foster parents or foster children in New York have some sort of "liberty" interest in the continuation of their relationship.[1] Rather than tiptoeing around this cen-

---

[1] The Court's opinion seems to indicate that there is no reason to distinguish between the claims of the foster parents and the foster children, either because the parents have standing to assert the rights of the children or because the parents' interest is identical to that of the children. See *ante*, at 841–842, nn. 44, 45. I cannot agree.

First, it is by no means obvious that foster parents and foster children have the same interest in a continuation of their relationship. When the child leaves the foster family, it is because the agency with custody of him has determined that his interests will be better served by a new home, either with his natural parents, adoptive parents, or a different foster family. Any assessment of the child's alleged deprivation must take into account not only what he has lost, but what he has received in return. Foster parents, on the other hand, do not automatically receive a new child with whom they will presumably have a more profitable relationship.

Second, unlike the situation in *Craig* v. *Boren*, 429 U. S. 190, 195–196, this is not a case where the failure to grant the parents their requested relief will inevitably tend to "[dilute] or adversely [affect]" the alleged constitutional rights of the children. Denying the parents a hearing simply has no effect whatever on the children's separate claim to a hearing, and does not impair their alleged constitutional rights. There is therefore no standing in the parents to assert the children's claims. See Note, Standing to Assert Constitutional Jus Tertii, 88 Harv. L. Rev. 423, 432 (1974), cited in *Craig, supra,* at 195.

I would nevertheless consider both the parents' and the children's claims in these cases, but only because the suit was originally brought on

tral issue, I would squarely hold that the interests asserted by the appellees are not of a kind that the Due Process Clause of the Fourteenth Amendment protects.

At the outset, I would reject, as does the Court, the apparent holding of the District Court that "the trauma of separation from a familiar environment" or the "harmful consequences of a precipitous and perhaps improvident decision to remove a child from his foster family," *Organization of Foster Families* v. *Dumpson,* 418 F. Supp. 277, 283, constitutes a "grievous loss" which therefore is protected by the Fourteenth Amendment. Not every loss, however "grievous," invokes the protection of the Due Process Clause. Its protections extend only to a deprivation by a State of "life, liberty, or property." And when a state law does operate to deprive a person of his liberty or property, the Due Process Clause is applicable even though the deprivation may not be "grievous." *Goss* v. *Lopez,* 419 U. S. 565, 576. "[T]o determine whether due process requirements apply in the first place, we look not to the 'weight' but to the *nature* of the interest at stake." *Board of Regents* v. *Roth,* 408 U. S. 564, 570–571. See *Ingraham* v. *Wright,* 430 U. S. 651, 672; *Meachum* v. *Fano,* 427 U. S. 215, 224; *Goss* v. *Lopez, supra,* at 575–576.

behalf of both the parents and the children, all of whom were parties plaintiff. While it is true that their interests may conflict, there was no reason not to allow counsel for the parents to continue to represent the children to the extent that their interests may be compatible. The conflict was avoided by the District Court's appointment of independent counsel, who took a position opposite to that of the foster parents as to where the children's welfare lay. The appointment of independent counsel, however, should not have left the children without advocacy for the position, right or wrong, that they are entitled to due process hearings. That position should have been left to be asserted by the counsel who originally brought the suit for the children. My view, therefore, is that the parents and the children are properly before the Court and entitled to assert their own separate claims, but that neither group has standing to assert the claims of the other.

Clearly, New York has deprived nobody of his life in these cases. It seems to me just as clear that the State has deprived nobody of his liberty or property. Putting to one side the District Court's erroneous "grievous loss" analysis, the appellees are left with very little ground on which to stand. Their argument seems to be that New York, by providing foster children with the opportunity to live in a foster home and to form a close relationship with foster parents, has created "liberty" or "property" that it may not withdraw without complying with the procedural safeguards that the Due Process Clause confers. But this Court's decision in *Meachum* v. *Fano, supra,* illustrates the fallacy of that argument.

At issue in *Meachum* was a claim by Massachusetts state prisoners that they could not constitutionally be transferred to another institution with less favorable living conditions without a prior hearing that would fully probe the reasons for their transfer. In accord with previous cases, see, *e. g., Goss* v. *Lopez, supra; Wolff* v. *McDonnell,* 418 U. S. 539; *Board of Regents* v. *Roth, supra; Perry* v. *Sindermann,* 408 U. S. 593; *Goldberg* v. *Kelly,* 397 U. S. 254, the Court recognized that where state law confers a liberty or property interest, the Due Process Clause requires certain minimum procedures " 'to ensure that the state-created right is not arbitrarily abrogated.' " 427 U. S., at 226, quoting *Wolff, supra,* at 557. But the predicate for invoking the Due Process Clause— the existence of state-created liberty or property—was missing in *Meachum* just as it is missing here. New York confers no right on foster families to remain intact, defeasible only upon proof of specific acts or circumstances. As was true of prison transfers in *Meachum,* transfers in and out of foster families "are made for a variety of reasons and often involve no more than informed predictions as to what would best serve . . . the safety and welfare of the [child]." 427 U. S., at 225.

Similarly, New York law provides no basis for a justifiable expectation on the part of foster families that their relationship will continue indefinitely. Cf. *Perry* v. *Sindermann, supra,* at 599–603. The District Court in this litigation recognized as much, noting that the typical foster-care contract gives the agency the right to recall the child "upon request," and commenting that the discretionary authority vested in the agency "is on its face incompatible with plaintiffs' claim of legal entitlement." 418 F. Supp., at 281. To be sure, the New York system has not operated perfectly. As the state legislature found, foster care has in many cases been unnecessarily protracted, no doubt sometimes resulting in the expectation on the part of some foster families that their relationship will continue indefinitely. But, as already noted, the New York Court of Appeals has unequivocally rejected the notion that under New York law prolonged third-party custody of children creates some sort of "squatter's rights." And, as this Court stated in *Perry* v. *Sindermann, supra,* at 603, a mere subjective "expectancy" is not liberty or property protected by the Due Process Clause.

This is not to say that under the law of New York foster children are the pawns of the State, who may be whisked from family to family at the whim of state officials. The Court discusses in Part III of its opinion the various state and local procedures intended to assure that agency discretion is exercised in a manner consistent with the child's best interests. Unlike the prison transfer situation in *Meachum* v. *Fano,* it does not appear that child custody decisions can be made "for whatever reason or for no reason at all." 427 U. S., at 228. But the protection that foster children have is simply the requirement of state law that decisions about their placement be determined in the light of their best interests. See, *e. g., Bennett* v. *Jeffreys,* 40 N. Y. 2d 543, 356 N. E. 2d 277; *In re Jewish Child Care Assn. (Sanders),* 5 N. Y. 2d 222, 156 N. E. 2d 700; *State ex rel. Wallace* v. *Lhotan,*

51 App. Div. 2d 252, 380 N. Y. S. 2d 250, appeal dismissed and leave to appeal denied, 39 N. Y. 2d 705. This requirement is not "liberty or property" protected by the Due Process Clause, and it confers no right or expectancy of any kind in the continuity of the relationship between foster parents and children. See, *e. g., Bennett, supra,* at 552 n. 2, 356 N. E. 2d, at 285 n. 2: "Third-party custodians acquire 'rights' . . . only derivatively by virtue of the child's best interests being considered . . . ."

What remains of the appellees' argument is the theory that the relation of the foster parent to the foster child may generate emotional attachments similar to those found in natural families. The Court surmises that foster families who share these attachments might enjoy the same constitutional interest in "family privacy" as natural families. See, *e. g., Moore* v. *East Cleveland, ante,* at 504–505 (plurality opinion of POWELL, J.); *Roe* v. *Wade,* 410 U. S. 113, 152–153; *Pierce* v. *Society of Sisters,* 268 U. S. 510; *Meyer* v. *Nebraska,* 262 U. S. 390.

On this score, the Court hypothesizes the case of "a child [who] has been placed in foster care as an infant, has never known his natural parents, and has remained continuously for several years in the care of the same foster parents . . . ." *Ante,* at 844. The foster family might then "hold the same place in the emotional life of the foster child, and fulfill the same socializing functions, as a natural family." *Ibid.*

But under New York's foster-care laws, any case where the foster parents had assumed the emotional role of the child's natural parents would represent not a triumph of the system, to be constitutionally safeguarded from state intrusion, but a failure. The goal of foster care, at least in New York, is not to provide a permanent substitute for the natural or adoptive home, but to prepare the child for his return to his real parents or placement in a permanent adoptive home

by giving him temporary shelter in a family setting. See Part I–A of the Court's opinion, *ante,* at 823–828. Thus, the New York Court of Appeals has recognized that the development of close emotional ties between foster parents and a child may hinder the child's ultimate adjustment in a permanent home, and provide a basis for the *termination* of the foster family relationship. *In re Jewish Child Care Assn. (Sanders), supra.*[2] See also *State ex rel. Wallace* v. *Lhotan, supra.* Perhaps it is to be expected that children who spend unduly long stays in what should have been temporary foster care will develop strong emotional ties with their foster parents. But this does not mean, and I cannot believe, that such breakdowns of the New York system must be protected or forever frozen in their existence by the Due Process Clause of the Fourteenth Amendment.[3]

One of the liberties protected by the Due Process Clause, the Court has held, is the freedom to "establish a home and bring up children." *Meyer* v. *Nebraska, supra,* at 399. If a State were to attempt to force the breakup of a natural family,

---

[2] "That the Sanders have given Laura a good home and have shown her great love does not stamp as an abuse of discretion the Trial Justice's determination to take her from them. Indeed, it is the extreme of love, affection and possessiveness manifested by the Sanders, together with the conduct which their emotional involvement impelled, that supplies the foundation of reasonableness and correctness for his determination. The vital fact is that Mr. and Mrs. Sanders are not, and presumably will never be, Laura's parents by adoption. Their disregard of that fact and their seizure of full parental status in the eyes of the child might well be, or so the Trial Justice was entitled to find, a source of detriment to the child in the circumstances presented." 5 N. Y. 2d., at 229, 156 N. E. 2d, at 703.

[3] The consequences of extending constitutional protection to the foster family relationship are, as the Court points out, *ante,* at 846–847, especially absurd when the child would otherwise be immediately returned to his natural parents. If the foster family relationship were to occupy the same constitutional plane as that of the natural family, the conflict between the constitutional rights of natural and foster parents would be totally irreconcilable.

over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest, I should have little doubt that the State would have intruded impermissibly on "the private realm of family life which the state cannot enter." *Prince* v. *Massachusetts,* 321 U. S. 158, 166. But this constitutional concept is simply not in point when we deal with foster families as New York law has defined them. The family life upon which the State "intrudes" is simply a temporary status which the State itself has created. It is a "family life" defined and controlled by the law of New York, for which New York pays, and the goals of which New York is entitled to and does set for itself.

For these reasons I concur in the judgment of the Court.