MEMORANDUM OF DECISION
CT Page 2642
Two years after Cynthia V. was removed from her parents, Marisol V. and Ruben V., the Department of Children and Families, hereafter "DCF", filed this petition for the termination of parental rights on December 20, 1996. Cynthia had been adjudicated neglected and was committed to DCF on May 17, 1995. She was placed into foster care as a result of an incident between her parents on October 4, 1994 in which Ruben beat Marisol to unconsciousness after Marisol exited from a vehicle in which she had been riding with friends. Cynthia, then almost three, was in the roadway in an infant seat. At present, Cynthia, age six, resides with her foster mother and has visitation with her mother three days a week.
Both parents have appeared and have court-appointed counsel. Each attended the three days of trial and one morning of closing arguments on February 5, 1998 and vigorously contested the petition. The court finds that it has jurisdiction in this matter and that there is no pending action affecting the custody of Cynthia in any other court
The allegations against Marisol are that her daughter has previously been adjudicated neglected and that she has failed to achieve such degree of personal rehabilitation as would encourage the belief that, within a reasonable time, considering the age and needs of the child, she could assume a responsible position in her life. Connecticut General Statutes § 17a-112 (c)(3)(B). Further alleged is that the child has been denied, by reason of an act of commission or omission, the care, guidance or control necessary for her physical, educational, or emotional well-being. Connecticut General Statutes § 17a-112 (c)(3)(C). The same grounds as well as abandonment and the failure to have an on-going relationship with the children were alleged against Ruben V. Connecticut General Statutes § 17a-112 (c)(3)(A), (B), (C) and (D).
The court, having heard the testimony of the many witnesses, having read the petition, the social study and its update, and the other documents entered into evidence makes the following factual findings:
A. FACTS
Until the time DCF became involved with Cynthia's parents in CT Page 2643 October of 1994, they had managed, despite considerable odds, to raise their daughter with little assistance. Marisol had left her own family some years earlier when she was thirteen. Her mother had left the household when she was seven and in the ensuing years, Marisol suffered emotional and physical abuse in the home. She left to stay with Ruben's family where she remained until she became pregnant at age sixteen. Ruben, then age eighteen, and she established their own apartment and on November 11, 1991 , their daughter was born. Marisol continued in high school through this time.
On October 4, 1994, she and some of her friends were out together. Ruben found them and followed them in another car. After Ruben rammed the car in which she was riding, Marisol got out with Cynthia in a car seat. She and Ruben began to argue and Ruben hit her repeatedly until she became unconscious. Subsequently, the two and the child returned to their apartment where they remained for several days. When Marisol returned to school, DCF and the police were waiting to interview her. Initially, she attempted to follow the guidelines DCF set and moved with Cynthia to New Haven to stay with her sister. She testified that her sister was engaged in drug use and she left to protect herself and Cynthia. Upon her return to the apartment, DCF removed Cynthia and filed the neglect petition.
1. As to the Mother. Marisol V.
Cynthia was placed in foster care in November of 1994 and both parents did not contest the neglect petition. Cynthia's adjudication as a neglected child took place the following spring. Because of the domestic violence between Ruben and Marisol, DCF required that Marisol not have contact with Ruben and for a period of time it was thought that there was no contact.
The requirement of Ruben's absence from the home was one that DCF did not communicate with any certainty or precision. At trial, from the testimony, it became clear that the separation of the parents was not a part of any court-ordered expectations, but had been contained in one service agreement signed by Marisol in the fall of 1995. This written request was in force for a period of six months and never again stated. Nowhere in the subsequent official documentation provided to the parents would the average person discern that their separation was crucial to the return of the child to her mother. The purpose of service agreements and CT Page 2644 court expectations, as stated in one such agreement signed by Marisol on March 29, 1996 "is to spell out in clear, understandable terms the responsibilities that each of the above named persons have in creating the conditions that must exist to achieve the goal of returning child to mother's care." (Emphasis in original). If no contact with Ruben was the linchpin of DCF's plan, as the DCF social worker Deana Miranda testified, it singularly failed to document its focus for Marisol.
The lack of clarity in the stated goals for Marisol is also apparent from the testimony of one of the service providers to Marisol and Cynthia. Ms. Haddock, who was the therapist for Marisol, provided family therapy with Cynthia and Marisol as well as being the child's therapist for a period of time. She testified that she knew reunification was the goal and that Ruben also was to reunify in the long term with his daughter. She saw the family in 1995, 1996 and once in 1997 in such therapy. She said in her therapy she dealt with issues of abuse, gaining assertiveness and conflict resolution, assuming that Ruben would be part of the family. At trial, Marisol admitted that she understood at times that Ruben was not to be present, although she did also testify to her confusion at other times about this requirement. Ruben did not visit with Cynthia for a substantial period of time because, according to others, he thought he was not permitted to visit.
The DCF social worker, Ms. Miranda, testified about the many referrals made for Marisol to assist her to regain custody of her child. Marisol was referred to individual counseling and parenting classes. She had participated in a young parents program prior to DCF involvement. She was to secure adequate income and housing. Initially, Marisol had supervised visits with Cynthia two times a week and then visits were increased to three times a week supervised by the foster mother. By the summer of 1996, reunification with Cynthia seemed just a short time way. Marisol was permitted unsupervised weekend visits with Cynthia in her apartment a period of four or five weeks in June and July of 1996. Her relationship to her daughter was excellent.
The plan in the summer of 1996 for reunification between Cynthia and her mother ended when DFC learned that Cynthia had made references to seeing Ruben and also because DCF did not know who was caring for the child while Marisol was working. There is no indication from the testimony of any witnesses that the overnight visitation did not proceed well or that there were any CT Page 2645 difficulties in the relationship between Marisol and her daughter. At that time, DCF confronted Marisol about her relationship to Ruben, which until now she had denied. When she and Ruben were seen together in September of 1996, she admitted that the relationship had continued. The worker also testified that by the summer of 1996, Marisol had not attended individual counseling nor anger management classes. Nonetheless, Marisol had worked at the same job at Pizza Hut for several years and was a valued and respected employee. She was able to maintain her own apartment and was prepared to have her child returned to her. As stated by Ms. Miranda, "except for the ongoing relationship with a potentially violent person, there were no major concerns." The court concludes from this testimony that but for Ruben's presence, reunification between Marisol and her daughter, Cynthia, would have taken place two years ago in the summer of 1996. The court further finds that this crucial requirement for reunification was not communicated to service providers or Marisol in clear and unequivocal terms.
What emerges from the testimony is that until the summer of 1996, Ruben and Marisol were not always together, but that after that time they had resumed their relationship. Marisol testified that there had been no incidents of physical violence between them until the beating which took place in October of 1994 and none since then. She states that they have lived in apartments with close neighbors and that no calls to the authorities have been made during this time. She admits that they do have disagreements and argue, but she maintains that domestic violence has not been part of their relationship since 1994. She does not believe there are problems in their relationship, but stated in court and to others in therapy, that she would end her relationship with Ruben if domestic violence became a problem and if Rubens's presence in the home prevented Cynthia's return.
Dr. Robert Meier, the court-appointed psychologist, evaluated Marisol and Cynthia in March of 1995. At that time, he concluded that visitation with Marisol should continue. He also stated that "Such visits should be conditional on mother having no contact with father, and father not being permitted to be present with mother and child without approved supervision." At the time of trial, having met with Ruben and evaluated him, he was still of this position. He also did not believe, because of the differing view Marisol and Ruben had about their relationship, that reunification was appropriate without significant safeguards as he could not rule out further violence. CT Page 2646
During Cynthia's foster home placement, Marisol has visited with Cynthia at all times available to her and has arranged her work schedule to permit her to exercise her rights to the fullest. While there were a few missed visits and some rescheduled ones, over a three year period, Marisol's record is laudable and reflects her determination to regain her daughter. She has had unsupervised visitation at the foster mother's house since 1996 three times a week which was still the schedule at the time of trial. Ms. Haddock testified that "mother and child are very engaged and bonded. They express their bond both emotionally and verbally." She stated that she saw significant improvement from the beginning of her sessions with Cynthia to her most recent sessions. She stated that the child had been withdrawn at school and thereafter, after the resumption of visitation, had made progress. During the time of her treatment, she stated that Cynthia "was waiting for the moment when she could go home and her mind was set on reunification." Dr. McKelvey, who provided individual counseling to Marisol, spoke of Marisol's devotion to her daughter. Both Ms. Haddock, Dr. McKelvey and Ms. Soto, who also provided therapy to Marisol, believed that Cynthia could be returned to her mother soon with appropriate safeguards. Ms. Haddock stated it would be harmful for Cynthia to detach from the goal of reunification with her mother.
2. As to the Father, Ruben V.
Ruben was arrested as a result of the incident which precipitated Cynthia's removal from her parents' care. He was charged with assault in the third degree and risk of injury to a minor. His sentence involved an alternative incarceration plan with intensive supervision and then probation for a period of four years, which he has not yet fully completed. From the testimony of his probation officer, the court concludes that Ruben has completed the terms of his intensive supervision and has managed, after initial difficulties, to remain drug-free. He has attended the counseling, drug and alcohol treatment and anger management programs required. His probation officer testified that Ruben now required only quarterly contact with him and had accomplished the rehabilitative programs of his probation. He was pleased with Ruben's progress and noted that he had been able to avoid further involvement with the criminal justice system.
Ruben's background is much like Marisol's and he grew up in a household with an alcoholic father and intermittent physical and CT Page 2647 emotional abuse. He left school in the tenth grade, has limited abilities, and finds it hard to hold any employment. He was evaluated by both Dr. Meier and Dr. Edington, a clinical psychologist. Dr. Edington testified that Ruben suffered damage from a car accident and also reported childhood cognitive difficulties and that his intellectual functioning is borderline. "Ruben finds it difficult to cope with stress and has a low frustration tolerance. Such individuals, he stated, do not do well in talk therapy, but require behavior modification assistance." Dr. Meier's opinion was much the same, noting that as of 1998, while Ruben reported being angry with Marisol, his resolution of such difficulties was to leave and take a time-out.
For Ruben, the Department made referrals to anger management, parenting classes and counseling. Ruben did not participate in such referrals until early in 1997. He began parenting classes together with Marisol in March of 1997. Both progressed well in the program and benefited from it, according to Ms. Haddock, who conducted the program, which consisted of educational sessions and group therapy sessions.
Ruben was not consistent with visitation with his daughter and did not have any visits for a considerable period of time, believing that he was not entitled to have such contact with his daughter. He expressed to Dr. Edington his sorrow at doing so and stated he missed his daughter. He was conflicted that he had not secured more contact with her earlier. As stated by Dr. Edington, Ruben's "emotional and intellectual functioning makes it difficult for him to secure services and to follow up on any requests he makes." His egocentric focus on the immediate concerns presented in his life also contribute to his inability to plan and pursue more long-term goals. He had some visits in 1995; in 1996 supervised visits were permitted if he called to arrange them and it was during this time that visits became fewer. By December of 1996, Ruben had not seen his daughter in a year. Nonetheless, by the summer of 1997, Ruben had arranged for more regular visits and continues to see his daughter on a supervised basis.
3. As to the Child, Cynthia V.
Cynthia was placed in foster care in November of 1994 and has remained in that home since that time. There were some early reported and observed developmental delays, but any early losses have been remedied. She enjoys school and is doing well. She CT Page 2648 cares for her foster mother, although she appears still to be more closely attached to her mother. Despite the fact that she has spent over three years in foster care, her foster mother is not willing to adopt her. Her foster mother acknowledges the strong connection between Cynthia and her mother. Cynthia frequently expresses her desire to return to her mother,
Cynthia also has a relationship with Ruben. Observers report that she carries his picture in her wallet and refers to him as "Poppi". Visitation between the two is quiet and Cynthia initiates most of the interaction. Ruben is very passive during the visits and the two play games together. When Cynthia saw her father during the evaluation conducted by Dr. Meier in 1997, she had not seen her father in over a year. She exhibited no fear of her father, Dr. Meier reported, and knew him as her father. She spontaneously went over to give him a hug.
B. ADJUDICATION
In the adjudicatory phase of a termination of parental rights, the court does not reach the issues of what is in the best interests of the child. "Our statutes and case law make it crystal clear that the determination of a child's best interests comes into play only after the statutory grounds for termination of parental rights have been established by clear and convincing evidence." In re Valerie D., 223 Conn. 492, 511, 613 A.2d 748, 758
(1992). The court cannot therefore at this stage consider the child's continuing connection to both her parents, but reviews only the facts proven regarding the allegations supporting the termination petition as of the date of the filing of that petition. Based on clear and convincing evidence, the court concludes that of the adjudicatory date, December 20, 1996, Marisol V. had failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of her daughter, she could assume a responsible position in her life. Connecticut General Statutes § 17a-112 (c)(3)(B). As of that date, she had not completed all of the expectations set for her and had yet to fully address in counseling the issues of domestic violence and its impact on her daughter. Further, Cynthia had been adjudicated neglected on May 17, 1995 and had been in foster care since November of 1994. The facts supporting this ground had existed for more than one year.
The court also finds by clear and convincing evidence that CT Page 2649 the three grounds alleged against Ruben V. have been proven by DCF. The first of those grounds, abandonment, focuses on the parent's conduct. In re Michael M., 29 Conn. App. 112,614 A.2d 832 (1992); In re Rayna M., 13 Conn. App. 23, 36,534 A.2d 897 (1987); In re Kezia M., 33 Conn. App. 12,632 A.2d 1122 (1993). "Abandonment occurs where a parent fails to visit a child, does not display love or affection for the child, does not personally interact with the child, and demonstrates no concern for the child's welfare." In re Juvenile Appeal (Docket No. 9489).183 Conn. 11, 14, 438 A.2d 801 (1981). Ruben V. has not pursued visitation with his daughter for more than a year prior to December 20, 1996 and under the law had abandoned her.
Ruben V. also had no ongoing relationship with his daughter at that time. "The question is whether they [the facts] substantiate a finding by clear and convincing evidence that no relationship ever existed between the parent and child, or that the relationship has terminated, without any future hope for its establishment or reestablishment." In re Midaglia M.,6 Conn. App. 194, 211, 504 A.2d 532 (1986);In re Juvenile Appeal (84-3), 1 Conn. App. 463,473 A.2d 795, cert. denied, 193 Conn. 802,474 A.2d 1259 (1984); In re Juvenile Appeal (Anonymous),177 Conn. 648, 670-671, 420 A.2d 875 (1979). That question is clearly answered by the clear and convincing evidence before the court. He had not visited with Cynthia in a year and was not then pursuing the relationship. He had not yet completed the court expectations regarding counseling, parenting education and other courses. The court concludes that as of December 20, 1996, Ruben V. had not rehabilitated and that at that time, there were no facts to support the belief that he would do so in the foreseeable future. The court finds as to Ruben V. that all three grounds have existed for substantially more than one year prior to the filing of the termination petitions on December 20, 1996.
As to allegations of omission and commission as against both parents, the court concludes that there is no evidence that Cynthia was denied the care, guidance or control necessary for her physical, education, moral, or emotional well-being during the period from her adjudication as a neglected child until the filing of the termination petition on December 20, 1996. The court has held that mere speculation of possible harm was insufficient for termination pursuant to these grounds, and that actual injury was required. In re Kelly S., 29 Conn. App. 600, CT Page 2650 614, 616 A.2d 1161, 1168 (1992). Unless such deprivation took place during visits with her mother or her father, DCF would be charged with such deprivation and not her parents. No such evidence was presented and accordingly, this ground is dismissed as to both parents.
C. THE BEST INTERESTS OF THE CHILD
This case turns on what is in Cynthia's best interests at the present time, the last day of trial on February 5, 1998. The parents' circumstances are remarkably different a year after the filing of the termination petition. The progress made is all the more unexpected if their behavior as of December 20, 1996 and earlier were all that was known to the court. Predicting the changes observable during this one year would not have been likely, given the past events and failure of both to participate in services. By all accounts, Marisol has completed all expectations set for her by the Department. She has completed parenting education and domestic violence counseling. She testified eloquently to her resolve both to better herself through her hard work and to secure the return of her daughter. Her life path since the birth of her child when she was sixteen reflects that determination. She stated that she would be willing to pursue whatever program DCF thought best for reunification and to immediately alert Cynthia's therapist if her daughter becomes upset or needs assistance. Ms. Haddock testified that she believes that reunification is in the child's best interests and that it is what Cynthia is looking forward to in the future. She also stated that she believes that reunification can take place within a short period of time, with intensive family preservation services, a parent aide in the home, and counseling sessions with both parents. She offered herself as a counseling resource to this family to accomplish this goal.
Dr. Meier in the update of his evaluation and in his testimony stated that:
 "If the child is to be returned to mother, there needs to be assurance that she would comply with service expectations in the future, the availability of those services would need to be assured, and a decision with regard to father's role in the family would need to be addressed. There would need to be very close supervision to insure compliance. As noted, it is the potential violence to which this child could be exposed that raises the most concern." CT Page 2651
At trial, he concluded that the highest priority for Cynthia is permanency. He stated that the current research and literature in the field indicates that permanency is crucial. He also admitted that if Cynthia were bonded to her mother, the loss of that relationship does have an effect. "There is a loss of identity when that process takes place."
Dr. McKelvey in a letter dated August 14, 1997[2] stated both Ms. Haddock and Ms. Soto "affirm that there is a strong and positive bond between Marisol and Cynthia and that Marisol has the ability to be a good mother." She recommended at trial that Marisol and her daughter be reunited. She recommended as safeguards that she be alone with her daughter during the beginning months of the reunification and not with Ruben during this time.
As stated by counsel for the minor child at trial, if Marisol's rights to her daughter are terminated, "the child will lose the only meaningful bond that she has." Her foster mother is not willing to adopt her and other than strangers with whom she might be placed, there are no other resources to provide this six year old child with permanency now, permanency which the professional witnesses agree she deserves and needs.
"A child's sense of time is based on the urgency of his or her instinctual and emotional needs and thus differs from an adult's sense of time, as adults are better able to anticipate the future and thus to manage delay." JOSEPH GOLDSTEIN, ET AL.,BEYOND THE BEST INTERESTS OF THE CHILD 98, (1979) "Also, the significance of parental absences depends upon their duration, frequency and the developmental time during which they occur. The younger the child, the shorter is the interval before a leave-taking will be experienced as a permanent loss accompanied by feelings of helplessness and profound deprivation. Since a child's sense of time is directly related to his capacity to cope with breaches in continuity, it becomes a factor in determining if, when and with what urgency the law should act." Ibid., p. 42.
Cynthia has been in foster care for three years and during those years, she has retained a significant relationship with her mother. She had only sporadic contact with her father until 1997, but also has a relationship with him and recognizes him as her father. Permitting more time to elapse before any permanent resolution to her placement is not appropriate, given the length CT Page 2652 of time she has already waited and the connections she has to her parents.
D. REQUIRED FINDINGS
The court makes the following factual findings required by Connecticut General Statutes § 17a-112 (e):
1) Appropriate and timely services were offered by the Department of Children and Families for both parents, including individual and group counseling, domestic violence counseling, parenting education, visitation and housing assistance. Until early 1997, Marisol did not complete all those programs although she had begun serious work on the issues confronting her earlier. Ruben did not take part in the services offered until 1997, but has progressed well, by all reports.
2) The court finds by clear and convincing evidence that the Department of Children and Families made reasonable efforts to reunify the family, given the situation and circumstances, as far as possible. The efforts in 1996 almost concluded with Cynthia's return to her mother.
3) The Department entered into reasonable and realistic court expectations and service agreements in order to reunify the family. While the court has indicated that better procedure could have resulted in a more definite and understandable expression of the requirement that Ruben was not to be in the home, nonetheless this requirement was known to Marisol and she sought to deny it. Those expectations set for both parents, with this exception, were reasonable and realistic. By the end of 1997 and before trial, the parents had complied with most of the expectations and requirements.
4) Cynthia exhibits strong emotional ties with her mother and a tie to her foster mother, who is not able to adopt her. She has a positive relationship with her father.
5) Finding regarding the age of the child. Cynthia is six years and four months old.
6) Finding regarding efforts of the parents to adjust their circumstances, conduct or conditions to make it in the best interests of the child to return her to their home in the foreseeable future and (a) the extent to which the parents have CT Page 2653 maintained contact with the child as part of an effort to reunite the child with the parents, provided that the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communications with the guardian or other custodian of the child. Marisol has maintained contact with Cynthia without fail and has adjusted her circumstances so that the court concludes it is in the child's best interests that Cynthia be returned to her. All experts testified to concerns about the involvement of Ruben and the potential for violence between Marisol and Ruben. Such concerns cannot be discounted and the court concludes that reasons for concern and the fashioning of appropriate safeguards for Ruben's eventual return to the home remain. Nonetheless, the court concludes that Ruben has taken significant steps since December of 1996 to adjust his circumstances to make such an eventual return of his daughter feasible.
7) Finding regarding the prevention of the parents from having a meaningful relationship etc. The court finds that DCF has taken many steps to encourage Marisol and Ruben to have a meaningful relationship with their daughter and to rehabilitate themselves, which they have each begun to accomplish since the filing of the termination petition. No unreasonable conduct is noted.
E. DISPOSITION
Cynthia has been out of her parents' care since November of 1994. In June and July of 1996, the process of returning her to her mother had begun with unsupervised weekend visits. That effort failed due to her father's presumed unauthorized presence in the home. Nonetheless, Cynthia expects to be reunified with her mother and looks forward to the day when it becomes her reality. She also has a relationship with her father. Marisol has made significant progress in dealing with the issues that led to Cynthia's removal, although more work remains to be completed. Ruben has begun to address those issues as well. The court concludes from the clear and convincing evidence that the termination of their rights to Cynthia is not in Cynthia's best interests and does not order termination at this time.
Cynthia also has a constitutionally protected right to family integrity. In Stanley v. Illinois, 405 U.S. 645, 651,92 S.CT. 1208 (1972), the United States Supreme Court affirmed the existence of' this right and also stated that it is not a right CT Page 2654 of the parents alone but "encompasses the reciprocal rights of both parents and children." She retains a right "in not being dislocated from the emotional attachments which derive from the intimacy of daily association with the parent. Smith v.Organization of Foster Families. 431 U.S. 816, 844,97 S. CT 2094 (1977), Duchesne v. Sugarman, 566 F.2d 817, 825 (2nd Cir. 1977), as quoted in In re Juvenile Appeal (83-CD),189 Conn. 276, 455 A.2d 1313 (1983). Cynthia is a young child with no other attachments left to her except those to her mother and secondarily, her father.
E. ORDERS
Cynthia was previously committed to the Commissioner of the Department of Children and Families. Her commitment was extended on September 17, 1997 until further order of the court. The court has carefully considered the various plans to which the experts testified as well as the unanswered concerns about Ruben's presence in the home. Based upon the evidence, the court finds that it is in Cynthia's best interests that her commitment to the care and custody of the Commissioner of the Department of Children and Families continue until September 16, 1998. The court further orders an in-court review of this matter on Friday, June 26, 1998 at the Child Protection Session and gives Marisol leave to file for revocation of commitment prior to that date, to be heard on that date, if required.
1. Reunification with Marisol, her mother:
During the next two months, the court orders that intensive reunification efforts begin during which Cynthia will spend overnight weekend visits with her mother commencing within two weeks of this order. DCF shall provide Intensive Family Preservation Services to Marisol and Cynthia. Marisol shall continue individual counseling and counseling with Cynthia to facilitate the child's full time return to her mother's care. The court directs that if at all possible, Ms. Haddock's services be secured for mother and daughter, given her familiarity with the issues and the parties.
2. Ruben V.
Ruben is not to be resident in Marisol's home during the period of Cynthia's return on a full time basis. Nonetheless, Ruben is to have continued and frequent contact with Cynthia. CT Page 2655 Such contact is to continue to be supervised. Further, he is to receive such counseling and further parent education as DCF may deem appropriate for him. If and when Cynthia returns to the home on a full time basis, and when indicated, Ruben should receive supervised visitation in the home at least weekly. Ruben shall participate in family therapy with Marisol and Cynthia after the first two months.
3. Other Additional Expectations
 a. Both parents shall maintain suitable housing and income with the Department to provide such assistance as resources permit;
 b. Ruben shall remain free from the use of illegal controlled substances and both parents from further involvement with the criminal justice system.
 c. Any domestic violence between the parents, whether in Cynthia's presence or not, shall be grounds for reassessment of the court orders.
It would be the court's expectation at the in-court review, if the recommendations of the therapists are correct and if reunification has proceeded without difficulty, that the following will be ordered at that time:
Protective supervision for a period of one year. During the period of protective supervision, a parent aide is to be provided to the family as well as other as may be required by both Marisol and Cynthia The goal is to facilitate the continued stability of Marisol and Cynthia and to provide such support services as both will undoubtedly require. This shall be the primary reunification and long term goal for the family.
The secondary goal is the introduction of Ruben into the family unit. The hope would be to begin with visits in the home at least twice a week leading to unsupervised visitation, at first for short periods of time once a week and increasing, if no difficulties persist to his ultimate resumption of residence in the household at the end of six months or sooner, as recommended by the therapists and/or other evaluators.
Barbara M. Quinn, Judge Child Protection Session CT Page 2656