# IN THE COURT OF APPEALS OF IOWA

No. 21-0574
Filed August 18, 2021

**IN THE INTEREST OF S.O.,**
**Minor Child,**

**S.O., Minor Child,**
    Appellant,

**F.O., Father,**
    Appellant,

**J.O., Mother,**
    Appellant.

_____

Appeal from the Iowa District Court for Crawford County, Mary L. Timko, Associate Juvenile Judge.

A mother, father, and child all appeal an order terminating parental rights. **AFFIRMED ON ALL APPEALS.**

T. Cody Farrens of Vriezelaar, Tigges, Edgington, Bottaro, Boden & Lessmann, L.L.P., Sioux City, for appellant minor child.

Peter A. Goldsmith of Boerner & Goldsmith Law Firm, P.C., Ida Grove, for appellant father.

Lori J. Kolpin of Kolpin Law Firm, P.C., Aurelia, for appellant mother.

Thomas J. Miller, Attorney General, and Meredith L. Lamberti and Charles K. Phillips, Assistant Attorneys General, for appellee State.

George C. Blazek of Franck, Sextro & Blazek, PLC, Denison, guardian ad litem for minor child.

Considered by Tabor, P.J., and Greer and Ahlers, JJ.

**TABOR, Presiding Judge.**

A mother, a father, and their child, S.O., all appeal the juvenile court order terminating the parent-child relationships. The court approved the State's request to terminate the rights of both parents, Fred and Jennifer, under Iowa Code section 232.116(1)(f) (2020). The court decided it was not safe for S.O. to return home based on founded allegations of sexual abuse lodged against Fred by his stepdaughter R.A. Both parents denied R.A.'s allegations of sexual abuse. Fred also had a history of domestic violence and instability. Meanwhile, Jennifer lacked the capacity to protect S.O. Neither parent pursued services as requested by the Iowa Department of Human Services (DHS). Given the credibility findings by the juvenile court and the parents' state of denial, we affirm the termination of their legal relationship with S.O.[1]

## I. Facts and Prior Proceedings

Fred and Jennifer married in 2007. It was a second marriage for both of them. Fred has three adult children. Jennifer has a daughter, R.A., born in 2002. R.A. lived with her mother and Fred after their marriage. Together, Fred and Jennifer have one daughter, S.O., born in 2008. The family raised horses and, as the girls grew up, they showed the horses at county fairs.

---

[1] We review orders terminating parental rights de novo. *In re W.M.*, 957 N.W.2d 305, 312 (Iowa 2021). While the juvenile court's factual findings do not bind us, we give them respectful consideration, particularly when they involve credibility determinations. *Id.* The State must prove the statutory ground for termination by clear and convincing evidence. *Id.* Meeting that standard means we harbor no serious or substantial doubts about the accuracy of the legal conclusions drawn from the evidence. *Id.*

But their family life was strained at times. For example, in 2015 Jennifer obtained a domestic abuse protective order, alleging Fred was verbally and physically abusive to her and the children. That same year, the DHS confirmed a report from R.A., then thirteen years old, that when she refused to eat a family meal of eggplant parmesan, Fred took a fork and forced the food down her throat until she coughed up blood.[2] Three years later, Jennifer again requested a protective order, alleging Fred was physically abusive to R.A. and "emotionally and verbally abusive" to the whole family. Jennifer also disclosed on the form for relief that Fred had sexually abused her.[3]

Another sexual-abuse allegation is central to this termination case. In the fall of 2018, R.A. revealed that Fred had been "touch[ing] [her] inappropriately" since she was in the sixth grade. At S.O.'s termination hearing, R.A. testified his conduct seemed innocent at first but degenerated. "Basically he would come up to my room in the middle of the night and he would do back rubs where he would scratch your back and then it would turn into more than that." R.A. explained as she "got older he would get more touchy," including holding her down and groping her "private parts."

She estimated the abuse happened "on and off for four years." Where was her mother when Fred came into R.A.'s room? R.A. recalled, "She was in her

---

[2] The juvenile court found it "disconcerting" that the parents made light of this event at the termination hearing, calling it the "eggplant incident."

[3] In her self-represented petition, Jennifer also alleged that Fred needed treatment for mental disabilities related to his service in the Navy. She added, "He was in a mental ward as a young boy. . . . I have been his caretaker for twelve years." In his psychosexual evaluation, Fred revealed that he was involuntarily committed at age seventeen because his adopted sister accused him of raping her at gunpoint. He denied the accusation.

bedroom probably sleeping." But R.A. testified she did tell her mother about the abuse. In response, Jennifer called a family meeting at which she admonished Fred to stop going into the bedrooms of R.A. and S.O. at night.[4] That admonishment did not stop the abuse, according to R.A.

Instead, it was R.A.'s disclosure of the abuse to her therapist, a mandatory reporter, that launched the DHS involvement with the family.[5] The DHS investigator arranged for both R.A. and S.O. to interview with the child protection center in Sioux City. In November 2018, R.A. told the interviewer that Fred "would touch her inappropriately over the top of clothing and skin to skin."

S.O. did not report any abuse by her father but did corroborate aspects of R.A.'s allegations. For instance, S.O. recalled that her father would come up to their bedrooms at night. S.O. also said R.A. told her about getting "back rubs."

After the family meeting, the mother said Fred would "no longer be giving back rubs" or checking on the girls at night. Fred denied the sexual abuse occurred. Yet the DHS child protection worker returned a confirmed child abuse finding for Fred's lascivious acts against R.A.[6] The worker also learned in January 2019 that Jennifer and Fred planned to leave Iowa for California with S.O.[7] Based

---

[4] R.A., S.O., and Fred all recalled that meeting. At first, Jennifer said it did not happen, but she later acknowledged calling a meeting on a different topic.

[5] After disclosing the abuse to her therapist, R.A. moved out of the home and went to live with her biological father.

[6] As a result of R.A.'s allegations, the State charged Fred with lascivious acts with a child and assault with intent to commit sexual abuse, and the State charged Jennifer with extortion and accessory after the fact. The charges were still pending at the time of the termination hearings.

[7] Jennifer and Fred represented at the removal hearing that they were just going on vacation. But text messages told another story.

on that information, the State successfully petitioned to remove both girls from the home.

Following the removal, the court adjudicated S.O. as a child in need of assistance (CINA) in March 2019. S.O. started out in the care of a relative. But disruptive actions by Fred led to her placement in foster care. The foster mother arranged for S.O. to see a therapist to address trouble she was having with peers at school. But when asked to complete paperwork approving that therapy, Jennifer and Fred procrastinated. The DHS eventually bypassed the parents to approve counseling. Despite going to therapy, S.O. continued acting out. She had tantrums where she would "ruin her belongings by tearing them up and throwing things." She often refused to shower and had issues with bed wetting. Her challenging behaviors led to two foster families giving notice to the DHS. All told, S.O. had six placements during the CINA case. At the time of the termination hearing, she was living in shelter care and awaiting transfer to a psychiatric medical institution for children (PMIC).

Through the rest of 2019, S.O. had supervised visits with her parents. The service provider noted that S.O. enjoyed seeing Jennifer and Fred, though they often discussed their unrealistic expectations that she would soon return home. The juvenile court believed the parents had trouble with boundaries. For example, on the Fourth of July when S.O. snuck away from her foster family's campsite and joined her parents at a fireworks display, Jennifer and Fred failed to notify anyone about the unsupervised contact. They later told the DHS that it was "no big deal." The DHS also arranged for S.O. to have a separate visit with R.A. Originally, S.O. was cold to the idea. But she later welcomed the

interaction. When asked about the change of heart, S.O. explained she always wanted to see her sister but had to "play along so that her parents didn't know what she wanted." The juvenile court would later observe the parents' relationship with S.O. had "an overriding air of manipulation" that was unhealthy.

After a September 2019 review hearing, the court noted the CINA case continued to be "very contentious" and the possibility of reunification was slipping away. Months into the case, the DHS could not determine whether Fred and Jennifer were engaged in the therapy necessary to address the sexual-abuse allegations that prompted the girls' removal. Both parents were "cagey" about providing information from the Veterans Administration (VA), where they sought counseling. It turned out the VA could not offer the type of therapy the DHS considered necessary for the parents to reunify with S.O. After the VA notified the parents that therapy to deal with sexual-abuse issues would have to be outsourced, they failed to follow up. Also troubling, at visitations with S.O., the parents would blame R.A. for their struggles. Social workers would have to redirect the conversation.

In January 2020, the DHS recommended termination of parental rights. The case coordinator asserted that, in thirteen months of involvement with the family, "very little progress" had been made. Her report stated, "Fred and Jennifer continue to act as though they are the victim[s] in this and [R.A.] is the root of all their problems." Before the February permanency hearing, S.O.'s guardian ad litem (GAL) moved to bifurcate the roles of GAL and legal counsel for the child under Iowa Code section 232.89(4). The GAL urged that he could not "adequately

fulfill both duties" given the DHS recommendation of termination and the child's wish for reunification. The court granted that motion.

In March, the State petitioned for termination of parental rights under Iowa Code section 232.116(1)(f). After several continuances, the termination hearing occurred over six days scattered from August 2020 to March 2021. At the end of the contested hearing, S.O.'s attorney asked the court to return the child to her parents' custody. He relayed her wishes: "My client unequivocally wants to go back home." In contrast, her GAL argued it was in S.O.'s "long-term best interests" to not return to the household with Fred and Jennifer.

The court issued its termination order in April 2021, finding clear and convincing evidence to support the ground for termination in the State's petition. In its ruling, the court discussed an exhibit filed by S.O.'s attorney, purporting to be a letter written by S.O. communicating her desire to go home. The court recognized that S.O. *did* want to go home and that she missed her horses and other pets. But the court was skeptical "as to whether or not [S.O.] actually wrote the letter." The court explained: "The tone is quite manipulative, i.e., making veiled threats of suicide, and a bit over the top if written by a ten year old." Ultimately, the court found termination of her parents' legal rights was in S.O.'s best interests, despite her wish to return to home.

S.O. appeals that ruling, as do both Jennifer and Fred.

**II.     Analysis**

**A.     Child's Standing to Challenge Termination**

In its response to the child's petition on appeal, the State argued that S.O. did not have standing to challenge the statutory grounds for termination of her

parents' rights under Iowa Code section 232.116(1). For that proposition, the State relied on *In re B.A.L.*, No. 12-1059, 2012 WL 3860816, at *4 (Iowa Ct. App. Sept. 6, 2012). Indeed, we have repeated that restrictive view of standing in two other unpublished cases. *See In re D.S.*, No. 17-1390, 2017 WL 6034636, at *5 (Iowa Ct. App. Dec. 6, 2017); *In re G.S.*, No. 13-0884, 2013 WL 4774040, at *4 (Iowa Ct. App. Sept. 5, 2013). But because we did not thoroughly analyze the concept of standing in those unpublished cases, we asked the parties for supplemental briefing on this point.[8]

Those briefs in hand, we start our analysis with the definition of standing. Standing addresses the "who," not the "what," of litigation. *Alons v. Iowa Dist. Ct.*, 698 N.W.2d 858, 864 (Iowa 2005) ("In short, the focus is on the party, not on the claim."). It is a rule of "self-restraint" that allows state courts to refuse to consider what may be a meritorious issue unless the complaining party shows "a specific personal or legal interest" and that the party is "injuriously affected." *Godfrey v. State*, 752 N.W.2d 413, 417–19 (Iowa 2008).

As the child's attorney argues on appeal, the question "becomes whether children in a termination proceeding have a sufficient right or interest at stake to meet this general rule for standing." When resolving that standing question, our unpublished cases have split the baby, so to speak. On the one hand, we have held that children lack standing to contest the statutory grounds for termination. *See, e.g.*, *D.S.*, 2017 WL 6034636, at *5; *G.S.*, 2013 WL 4774040, at *4; *B.A.L.*, 2012 WL 3860816, at *4. *But see In re A.D.*, No. 20-1182, 2020 WL

---

[8] We thank all five counsel for their quick turnaround and well-thought-out positions in their supplemental briefs.

7022391, at *1 n.2 (Iowa Ct. App. Nov. 30, 2020) (noting no party objected to participation of the children in the appeal on their own behalf). On the other hand, we have entertained briefing by children's attorneys on other issues. *See, e.g.*, *In re T.P.*, 757 N.W.2d 267, 272 (Iowa Ct. App. 2008) (best interests under section 232.116(2)); *D.S.*, 2017 WL 6034636, at *5 (same); *G.S.*, 2013 WL 4774040, at *4 (objections to termination under section 232.116(3)); *B.A.L.*, 2012 WL 3860816, at *4 (both sections 232.116(2) and 232.116(3)).

In their supplemental briefs, no party outright opposes finding that S.O. has standing to contest the grounds for termination of her parents' rights or to raise the other issues in her petition on appeal filed by her attorney. Naturally, S.O., through counsel, makes the most forceful argument. She contends: "It seems obvious that children involved in these proceedings have a personal interest at stake. A termination of parental rights acts to sever the parent/child relationship, forever altering a child's life." Jennifer echoes that sentiment. She expands on the personal and legal interests of the child in a termination case:

> From the legal aspect the existence or absence of the relationship also affects the child from a financial[] perspective through inheritance and also through relationships which stem from [a] parent-child relationship. A child's world, relatives, resources and identity are all shaped by their parental relationships. It is logical then to also reason that any loss or changes to the parent-child relationships may result in injury to the child.

Fred likewise adopts the position taken by S.O.'s attorney.[9]

---

[9] The father's supplemental brief also asserts that, because he has standing and has incorporated by reference S.O.'s petition on appeal, the issue is moot.

Even the GAL, who advocates for affirming the termination order, "thinks standing should be granted to the child to challenge the statutory grounds of termination" as well as the other issues on appeal. The GAL reasons:

> Besides being a logical application of the doctrine of standing, granting standing to children to make arguments on appeal will promote justice by giving children in Iowa a greater voice in termination of parental rights proceedings. This is particularly important in cases, like this one, where the child is old enough to express a meaningful opinion on whether termination should happen.

Finally, we turn to the State's briefing on standing. The State offers a helpful survey of the limited guidance from other jurisdictions on this question. The State first points to a Florida case in which the court held that a child could not bring a termination-of-parental-rights case in his own right. *See Kingsley v. Kingsley*, 623 So. 2d 780, 784 (Fla. Dist. Ct. App. 1993) (holding fact that minor was represented by counsel was not sufficient because child must sue by "next friend").

According to the State, jurisdictions that have found children have standing to challenge the termination of their parents' rights have relied on their specific state statutes. *See, e.g.*, *In re Z.H.*, Nos. C-150305, C-150301, 2015 WL 4755282, at *1 (Ohio Ct. App. Aug. 12, 2015) (finding children have standing to appeal termination through appointed counsel because children have statutory right to be raised by their natural families under Ohio Revised Code section 2151.01(A)); *see also* Neb. Rev. Stat. § 43-2,106.01 (2020) (granting right to appeal to juvenile, in addition to GAL; parent, custodian, or guardian; and county attorney); 23 Pa. Stat. and Cons. Stat. Ann. § 2512(1) (2020) (listing parties who may petition to terminate parental rights, which includes either parent, the agency, a person having custody of the child, or the child's attorney or GAL). By contrast, the State notes that Iowa's

statutory list of parties who may petition for termination includes the child's guardian, GAL, or custodian; the DHS; a juvenile court officer; or the county attorney—but not the child's attorney. Iowa Code § 232.111(1)[10]; *see In re A.L.*, 492 N.W.2d 198, 201 (Iowa Ct. App. 1992) (citing section 232.111 in finding GAL had standing to bring appeal).

Despite that statutory difference, the State "takes no position on whether a child has standing to contest the grounds of termination through their attorney, and instead seeks the court's guidance on the question of standing." The State contends the child's challenge to reasonable efforts and request for additional time to reunify are tied to the statutory-grounds contest. As for the other issues on appeal, the State argues: "There is no need to depart from the court's prior rulings that children have standing to raise a challenge to termination under Iowa Code sections 232.116(2) and 232.116(3)."

Accepting the State's invitation, we now provide that guidance. As discussed above, we have summarily held in unpublished cases that children lack standing to raise a challenge under section 232.116(1). *See D.S.*, 2017 WL 6034636, at *5; *G.S.*, 2013 WL 4774040, at *4; *B.A.L.*, 2012 WL 3860816, at *4. While we strive for consistency in our panel decisions, our unpublished opinions are not "controlling legal authority." Iowa R. App. P. 6.904(2)(c); *accord State v. Shackford*, 952 N.W.2d 141, 145 (Iowa 2020) (explaining unpublished decisions

---

[10] Beyond the list of potential petitioners in section 232.111(1), section 232.111(3) allows the DHS, juvenile court officer, county attorney, or judge to "authorize any competent person having knowledge of the circumstances to file a termination petition." *See In re S.R.*, No. 00-0884, 2001 WL 539670, at *1 (Iowa Ct. App. May 23, 2001).

"are not precedential"); *State v. Lindsey*, 881 N.W.2d 411, 415 n.1 (Iowa 2016) (noting "unpublished decisions of the court of appeals do not constitute binding authority"). Today, we choose not to follow *D.S.*, *G.S.*, and *B.A.L.*

We make this about-face, in part, because the foundation for those opinions rested on claims asserted by parents, not children. All three unpublished cases cited two published cases, *In re K.R.*, 737 N.W.2d 321 (Iowa Ct. App. 2007) and *In re D.G.*, 704 N.W.2d 454 (Iowa Ct. App. 2005). In *D.G.*, our court held that *one parent* cannot assert facts or legal positions pertaining to the *other parent* because the juvenile court makes a separate adjudication as to each parent. 704 N.W.2d at 460. In *K.R.*, we cited *D.G.* in finding a father lacked standing to assert an argument on the mother's behalf to "gain a benefit for himself, that is, reversal of the termination of *his* parental rights." 737 N.W.2d at 323.

As the parties contend in their supplemental briefs, *D.G.* and *K.R.* are not good analogs to decide the question of the *child's* standing. Jennifer effectively describes the difference: "Each parent has a relationship with their child; one that is separate and distinct from the relationship the other parent has with the same child." So one parent cannot argue for preservation of their rights based on the situation of the other parent. *See D.G.*, 704 N.W.2d at 459 (deciding it was impossible for mother to join father's best-interests arguments on appeal).

That principle does not apply to the child. Unlike the parallel tracks of the parents' appeals, the child's rights intersect with the fortunes of the parents. For instance, it is possible for S.O. to argue in her petition on appeal that the State failed to prove by clear and convincing evidence that she could not be safely returned to the custody of her parents under Iowa Code

section 232.116(1)(f)(4). That possibility exists because the child shares the parents' fundamental interests in familial association. *See F.K. v. Iowa Dist. Ct.*, 630 N.W.2d 801, 808 (Iowa 2001) (citing *Lehr v. Robertson*, 463 U.S. 248, 256 (1983) (noting reciprocal nature of interest in parent-child relationship)).

What's more, we do not see exclusion of a child's attorney from the list of petitioning parties in section 232.111(1) as an impediment to the child's standing to contest the grounds for termination. Unlike the Florida court in *Kingsley*, we are not faced with a child petitioning for termination of parental rights. Rather, the question is whether S.O.—through her attorney—can *object* to the statutory basis for termination on appeal. We have held that a child's GAL has standing to do so. *See In re J.C.*, No. 03-0949, 2003 WL 22345729, at *1 n.2 (Iowa Ct. App. Oct. 15, 2003). When the juvenile court has bifurcated the role of GAL and child's attorney under section 232.89(4), we see no reason why the child's attorney would lack standing to do the same. The language in sections 232.89(2) and 232.89(4) places a child's attorney and the GAL on equal footing, showing the legislature intended a separate attorney for the child to pursue the child's legal interest with the same force and effect as the GAL's representation. *See In re J.C.*, 857 N.W.2d 495, 500 (Iowa 2014) (noting unambiguous statutory language is strongest evidence of legislative intent).

Finally, we recognize that "the parents and the child share an interest in avoiding erroneous termination." *See Santosky v. Kramer*, 455 U.S. 745, 765 (1982) (holding due process requires the State to support its allegations by clear and convincing evidence). And as the Supreme Court reasoned: "the Due Process Clause would be offended '[i]f a State were to attempt to force the breakup of a

natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest.'" *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978) (alteration in original) (quoting *Smith v. Org. of Foster Fams.*, 431 U.S. 816, 862–63 (1977)).

In sum, we find S.O. has a specific, personal, and legal interest in the action to terminate her parents' rights and may be injuriously affected by the outcome. *See Hawkeye Bancorporation v. Iowa Coll. Aid Comm'n*, 360 N.W.2d 798, 801 (Iowa 1985). We are persuaded by the parties' arguments that the child has a personal, emotional stake in the court's decision to terminate parental rights, as well as a financial stake in maintaining the legal relationship with her biological parents. Thus, she has standing to challenge the statutory ground for termination along with the other issues raised in her petition on appeal.

## B.    Statutory Ground for Termination

S.O., Jennifer, and Fred all dispute the statutory ground for termination. At issue is the fourth element of section 232.116(1)(f).[11] To satisfy that element, the State must show by clear and convincing evidence that S.O. could not be returned

---

[11] The juvenile court may terminate parental rights under this statutory alternative if the State establishes these elements:
>    (1) The child is four years of age or older.
>    (2) The child has been adjudicated a child in need of assistance pursuant to section 232.96.
>    (3) The child has been removed from the physical custody of the child's parents for at least twelve of the last eighteen months, or for the last twelve consecutive months and any trial period at home has been less than thirty days.
>    (4) There is clear and convincing evidence that at the present time the child cannot be returned to the custody of the child's parents as provided in section 232.102.

Iowa Code § 232.116(1)(f).

to the custody of her parents under section 232.102 at the time of the termination hearing. *See In re A.M.*, 843 N.W.2d 100, 111 (Iowa 2014).

S.O. argues the State focused on allegations that Fred sexually abused R.A. but failed to present evidence that S.O. "suffered or is at risk of suffering sexual abuse." She points to an opinion offered by a forensic psychologist, Tracy Thomas, that even assuming Fred molested his stepdaughter R.A., it was unlikely Fred would direct similar abuse at his biological child, S.O. The child's attorney also argues that S.O. feels "safe" going home and that the State presented no evidence she would encounter emotional abuse or controlling behavior by her parents.

Jennifer argues the State presented "no credible evidence" that placing S.O. in her care would be unsafe or cause the child any harm. She highlights the parents' thirteen-year marriage, their financial stability, and their "100%" participation in the visits offered to them. She also asserts they were cooperating with services and engaged in counseling. Fred likewise insists that S.O. would be safe living with him and Jennifer. For support, he points to their own testimonies as well as the opinions of his lay character witnesses[12] and Dr. Thomas.

In its response, the State rebuts the parents' claims that they have obtained appropriate therapy.

> They did engage in therapy at the VA, but were told repeatedly that the VA could not provide the therapy requested by the Department. The therapy notes from the VA state that many therapists informed the parents they would not be able to address the Department's concerns. When one therapist broached the topic

---

[12] According to the juvenile court, "Many of the witnesses did not seem to realize that there had been domestic violence and physical abuse in the home that was documented in requests for no-contact orders and founded child abuse reports."

with the parents, Fred dismissed the issue by telling the therapist that the "DHS treatment requests are irrelevant, as he will not go down the path of taking accountability" since he maintains he did not commit sexual abuse against [R.A.].

The State also clarifies the expert opinion on Fred's likelihood of recidivism. Dr. Thomas believed that Fred posed a below average risk when compared to other men who had been charged with or convicted of sexual offenses. But she did not give an opinion about his risk to S.O. specifically. She also did not offer a risk assessment for whether Fred would engage in sexually deviant behavior in the future. Rather, she assessed whether he would engage in behavior resulting in a criminal charge or conviction.

Responding to Jennifer's arguments, the State insists the mother cannot protect S.O. from the danger of inappropriate sexual advances by Fred if she disbelieves her daughter R.A. and denies he has those tendencies. The State discounts Jennifer's promise that Fred would never be alone with S.O. and that she would install cameras to ensure he did not go into her room at night. The State paraphrases a recent opinion from our supreme court: "it's folly to think [Jennifer] would stand sentinel to protect against a foe she doesn't acknowledge exists." *See In re D.D.*, 955 N.W.2d 186, 193 (Iowa 2021).

Like the juvenile court, we find clear and convincing evidence in the record to show S.O. cannot be returned to the custody of her parents without risking exposure to harm that could amount to a new CINA adjudication. *See* Iowa Code §§ 232.102, 232.116(1)(f). The court found R.A.'s allegations of sexual abuse by Fred to be credible. Yet the parents deny those allegations. They blame R.A. for the family's problems and manipulate S.O. to share that warped perspective.

As for the expert's opinion, it is cold comfort that Fred would be less likely to sexually abuse his biological daughter. Without any therapy to address the family's dysfunction, the parents cannot offer a safe and healthy atmosphere for S.O. We are drawn to this insightful observation by the juvenile court: "Before any meaningful change can take place, a parent must acknowledge and recognize that abuse occurred." Neither Jennifer nor Fred is willing to admit Fred's history of sexually abusing R.A. or his controlling behavior toward other family members. Thus, reunification is not safe for their daughter.

## C.     Reasonable Efforts

S.O. and her parents next claim the DHS did not offer reasonable services to address the concerns that led to removal. The child's attorney argues the services should have been more targeted toward the sexual-abuse allegations against Fred. Fred also contends he was not offered appropriate counseling. The mother and father both urge that the DHS should have provided expanded, unsupervised visitation.

Granted, the DHS must "make every reasonable effort to return the child to the child's home as quickly as possible consistent with the best interests of the child." *In re C.B.*, 611 N.W.2d 489, 493 (Iowa 2000) (quoting Iowa Code § 232.102(7)). And the burden is on the State to "show reasonable efforts as a part of its ultimate proof the child cannot be safely returned to the care of a parent." *Id.*

The State met its burden here. We focus on the parents' responses to the services provided. *Id.* at 494. The DHS offered services to Fred and Jennifer consistent with S.O.'s best interests. It offered an appropriate level of visitation

while the parents were refusing to engage in the expected counseling. As for counseling, the DHS provided a list of expectations and a list of counselors who could address those expectations. The VA also tried to coordinate community services for the parents that would be paid for by the VA. The father rejected those proposals. On this record, we find the DHS met the reasonable-efforts requirement.

### D. Permissive Factors Under Section 232.116(3)

S.O. argues the juvenile court should have looked to the permissive factors under Iowa Code section 232.116(3) to forego termination. In particular, her attorney argues termination was improper because (1) S.O. was older than ten years and objected to ending the parent-child relationship, and (2) she was approved for placement in a PMIC. *See* Iowa Code § 232.116(3)(b), (d). Jennifer also relies on paragraph (b) in contending the court should not have terminated her rights over S.O.'s objection.

No question, S.O.'s wishes deserve respect. She was nearly thirteen years old by the time of the termination hearing and, through counsel, expressed a clear desire to return home. A psychologist testified that her evaluation of S.O. showed the child to have "average" intelligence but only "fair" insight and judgment. The psychologist also testified that "emotional issues" may affect an individual's judgment in ways that are "not always reflected in their IQ." On top of that, the juvenile court detected an undercurrent of manipulation by S.O.'s parents that undermines the independence of her wishes.[13]

---

[13] S.O. contends the juvenile court erred in questioning whether she actually wrote the letter expressing her desire to go home. Like the juvenile court, we find the

Against this backdrop, we conclude what S.O. wants is not in her best interests. *See In re A.R.*, 932 N.W.2d 588, 592 (Iowa Ct. App. 2019) (setting out factors under section 232.116(3)(b)). In our review of the record, we note that S.O.'s longing to go home appears to be as much about missing her horses and other pets as it does with repairing the long-term relationship with her parents. Thus, we do not believe this permissive factor required the juvenile court to bypass termination. *See In re J.S.*, No. 16-0112, 2016 WL 899857, at *3 (Iowa Ct. App. Mar. 9, 2016) ("The children's yearning for reunification does not tilt the balance away from termination.").

As for section 232.116(3)(d), we conclude the approval for S.O.'s placement in a PMIC did not change the termination equation. The record does not show that she could return to her parents' care following discharge from that program. *See In re J.R. II*, No. 12-1239, 2012 WL 4903048, at *3 (Iowa Ct. App. Oct. 17, 2012).

The permissive factors in section 232.116(3) are not cause for reversing the termination order.

### E.    Six-Month Delay of Permanency

Both parents and S.O. request more time to work toward reunification. *See* Iowa Code §§ 232.104(2)(b), .117(5). To grant an extension, the juvenile court needs evidence to support a finding the parents could properly care for the child within six months. *Id.* § 232.104(2)(b). We do not favor delaying permanency here. As the State argues, the lack of progress stems from the

---

tone of the letter may reflect the parents' coaching. But the authorship of the letter is not critical to our decision to affirm.

parents' "stubborn refusal to engage in appropriate therapy."  Nothing in the record suggests the parents will budge from that refusal.

Moreover, the months of uncertainty have taken a toll on S.O.  In October 2020, she was hospitalized for "significant mental trauma and suicidal ideations."  Postponing permanency would only add to her stress and insecurity.  We decline to delay the termination decision.

**AFFIRMED ON ALL APPEALS.**